O'Connor, C.J.
*497 {¶ 1} A jury in Summit County convicted appellant, Richard Beasley, of the aggravated murders of Ralph Geiger, David Pauley, and Tim Kern and the attempted murder of Scott Davis. The jury recommended, and the trial judge imposed, three sentences of death. Beasley now brings this direct appeal of right.
{¶ 2} We affirm Beasley's convictions as well as his capital sentences. We vacate his sentence for his noncapital convictions and remand the case for the limited purpose of resentencing Beasley on those convictions.
I. FACTUAL AND PROCEDURAL BACKGROUND
A. The State's Case-in-Chief
{¶ 3} The state called 42 witnesses to establish the following facts.
1. August 2011: Ralph Geiger
{¶ 4} At one time, Ralph Geiger operated a successful construction business. But by February 2011, he was homeless and living at a shelter in downtown Akron. He left the shelter in early August 2011, telling the staff and a friend that he had a job on a farm in southern Ohio. Summer Rowley, a friend of Geiger's, testified that Geiger told her that he would not be able to talk to her from the farm because he would not have cellphone coverage. Although they had spoken daily when Geiger was at the shelter, after he left, she never heard from him again.
{¶ 5} On August 8, Geiger checked into the Best Western Hotel in Caldwell, a town in eastern Ohio between Cambridge *1040 and Marietta. Three adults were registered in the room for one night. Rowley identified Geiger's signature and the *498 phone number on the hotel registration form as his, and she testified that the driver's license photocopied by the hotel at check-in belonged to Geiger.
2. Summer 2011: Richard Beasley
{¶ 6} Beasley stayed for a few nights in the basement of the house of his friend Joyce Grebelsky on Cramer Avenue in Akron in the spring of 2011. Grebelsky testified that Beasley later asked her to start calling him "Ralph Geiger" because he wanted to be a different person and did not want to go back to jail.
{¶ 7} On August 31, 2011, "Geiger" submitted an employment application to Tech Center, Inc., listing a home address on Cramer Avenue and "Joyce Grabowski" as an emergency contact. The next day, "Geiger" submitted an employment application to Waltco Trucking Company, again using the Cramer Avenue address and identifying "Joyce Grebowski" as a reference. Alex Hartke, a Waltco employee, testified that he worked alongside "Geiger" in September and October 2011, and he identified Beasley as the man he knew by the name "Ralph Geiger."
{¶ 8} On September 19, 2011, "Geiger" opened a checking account at PNC Bank, using the Cramer Avenue address. Activity in the account included the deposit of two checks from Tech Center payable to "Ralph Geiger" and a check written to Grebelsky dated October 3, 2011.
{¶ 9} The day after he opened the PNC account, "Geiger" sought medical treatment for chronic pain at Akron Community Health Resources, Inc., where he was seen by Dr. Michelle Moreno. Dr. Moreno testified that the patient was seeking prescription painkillers. He told Dr. Moreno that he had had a cervical fusion, the result of an accident involving a dump truck, and had been seeing a doctor in Tijuana, Mexico, for narcotics. Dr. Moreno had him sign a medical release, treated his high blood pressure, prescribed a nonnarcotic pain reliever, and told him to return in seven days. The man returned to see Dr. Moreno on September 27, 2011. In the interim, Dr. Moreno had tried without success to get records from the Tijuana clinic.
{¶ 10} Other witnesses testified about meeting a man in 2011 who called himself "Ralph Geiger." In July or August, Don Walters Sr. was introduced to a man who went by the nickname "Dutch." Once, while shopping together, Walters saw "Dutch" use identification in the name of "Ralph Geiger." And in August or September 2011, Joe Bais rented a room in his house on Shelburn Avenue in Akron to a man who went by the name "Dutch" but whose driver's license said "Ralph Geiger." At trial, Bais and Walters both identified Beasley as "Ralph Geiger" or "Dutch."
*499 3. October 2011: Daniel DeWalt
{¶ 11} In October 2011, Daniel DeWalt applied by e-mail to be the caretaker of a cattle farm in Caldwell, Ohio, a job he had found advertised on Craigslist. After receiving an e-mail response, DeWalt agreed to meet a man named "Jack" at the Chapel Hill Mall food court in Akron.
{¶ 12} When they met, "Jack" told DeWalt that his uncle, Bob Gaylord, owned a farm in Caldwell and needed someone to start work right away because a nearby road was blocked by a landslide. DeWalt filled out an application. A few days later, "Jack" offered DeWalt the job. DeWalt packed his belongings into a U-Haul trailer in preparation for the move.
{¶ 13} But problems arose. DeWalt told "Jack" that he was bringing his pistol. "Jack" initially said that was okay but then changed his mind, saying, "I'm the only one with a gun." DeWalt also told "Jack" that he had been unable to find the alleged *1041 property on the county auditor's website, indicating, "[T]his ain't adding up."
{¶ 14} Additionally, "Jack" wanted to buy DeWalt's SUV and truck. He asked to pick up the vehicles on a Friday, promising to pay on the following Sunday when they got to the farm. DeWalt objected, saying, "[W]hat if somebody is trying to get my vehicles before I come down there, and then when I get down there, shoot me and take my stuff." "Jack" replied, "[Y]ou shouldn't have said that," and indicated that now he needed to consult with his uncle. On October 15, 2011, DeWalt received an e-mail from "JG" at rohandannaher@gmail.com withdrawing the job offer. At trial, DeWalt identified Beasley as "Jack Gaylord."
4. October 2011: George Brown
{¶ 15} George Brown, semiretired from the concrete business, wanted a job to supplement his income. On October 7, he answered a Craigslist ad for a job taking care of cattle in southern Ohio. The ad promised a trailer to live in, a credit card, and $300 to $400 a month.
{¶ 16} Brown arranged to meet "Jack" at the Chapel Hill Mall food court. The interview was going well until Brown mentioned his lifelong involvement in martial arts, at which point "Jack" "kind of sat back in his chair." Brown also informed "Jack" that for a while, he had worked as a security officer. "Jack" pulled back Brown's application and abruptly ended the interview. Brown never heard from "Jack" about the job. At trial, Brown identified Beasley as "Jack."
5. October 2011: Dave LeBlond
{¶ 17} In October 2011, Dave LeBlond was looking for work. He responded to a listing on Craigslist for a job as a farmhand on a 300-acre farm. A man who identified himself as "Richard Bogner" interviewed LeBlond at the Chapel Hill *500 Mall. During the interview, LeBlond told "Bogner" that he had a fiancée. He was never contacted again about the job. LeBlond identified Beasley as the man he met at the mall.
6. October 2011: David Pauley
{¶ 18} David Pauley lived in Norfolk, Virginia. He had been unemployed for about two years when he responded to a Craigslist ad for a farm caretaker on October 9, 2011. Pauley told his twin sister, Debra Bruce, about a job opportunity he found through Craigslist on a 688-acre farm taking care of cattle for $300 a week. He would be provided a trailer to live in and could bring all his belongings with him. Sometime thereafter, Pauley told Bruce he had been hired and that he would be leaving Norfolk for Ohio on October 22. Pauley traveled to Ohio in his blue pickup truck, pulling a U-Haul trailer containing all his possessions.
{¶ 19} Bruce spoke to her brother twice on October 22, once to arrange payment for his hotel room in West Virginia and again around 8:00 or 9:00 p.m. She never heard from him again.
7. October 2011: Richard Beasley
{¶ 20} Prior to October 23, Beasley told Don Walters that he had bid on a storage unit, like on the TV program "Storage Wars." At 1:09 p.m. on October 23, Beasley called Walters. He told Walters that he got the unit, that it came with a truck and a U-Haul full of things, and that he needed a place to store the items until he could sell them.
{¶ 21} Shortly after, Beasley arrived at Walters's home driving a blue Dodge pickup pulling a U-Haul trailer. At trial, Walters identified a photograph of the truck. Bruce identified that same photograph as Pauley's truck.
{¶ 22} Another car pulled in behind Beasley, driven by a young man Beasley introduced as his nephew. Walters later learned that the young man's name was *1042 Brogan Rafferty. The three men unloaded the trailer, which was filled completely with bags and crates, and put the items into Walters's garage. Among the items was a laptop computer.
{¶ 23} Beasley came back to Walters's house the next day, filling his truck twice with the items, including the laptop, that he wanted to take. He left behind the rest of the items, including an assortment of Christmas decorations that he said Walters could keep as payment for storing the items.
{¶ 24} Joe Bais, Beasley's former landlord, testified that in October, Beasley, whom Bais knew as "Ralph Geiger" or "Dutch," had a truckload of stuff, including ammunition cases containing nuts and bolts, Christmas lights, and train sets, that he offered to Bais in trade for his computer. Bais bought some of the Christmas lights and ammunition cases.
*501 {¶ 25} On October 24, 2011, Carla Conley, a U-Haul employee in Akron, saw two men drop off a trailer that was supposed to be returned in Marietta. At trial, Conley identified Beasley as one of the men.
8. November 2011: Scott Davis
{¶ 26} Scott Davis was a self-employed landscaper in South Carolina. Because he wanted to move back to Ohio, he began searching Craigslist for job opportunities and found a posting for work on a cattle farm. The ad promised a two-bedroom trailer on a 688-acre farm and $300 a week.
{¶ 27} Davis responded to the ad on October 9, 2011, and received a reply on October 17, 2011, from rohandannaher@gmail.com. The message asked Davis to send a copy of his driver's license for a background check and asked whether he had a truck or tools. The message was signed "Jack." After further communication by e-mail, "Jack" told Davis that he had the job. Davis packed some of his belongings in a trailer and drove to Ohio.
{¶ 28} Davis met "Jack" for breakfast at a Shoney's restaurant in Marietta on November 6. "Jack" arrived with a younger man that he introduced as his nephew. The restaurant's security camera captured an image of two men, whom Davis identified at trial as "Jack" and his nephew, waiting for a table.
{¶ 29} After breakfast, the three men put gas into Davis's truck and then left together in a white car to drive to the farm. They drove for around 15 minutes until "Jack" told the nephew, "Drop me off where we got that deer last week." Davis and "Jack" then got out of the car, and "Jack," after telling his nephew to drive up the road and turn around, led Davis into the woods beside a creek. But after walking farther into the woods, "Jack" said, "Forget this, let's turn around and take the roadway."
{¶ 30} Davis turned around to head back to the road and then heard a click and a curse word. He spun around to see "Jack" raising a gun. "Jack" fired the gun and Davis was hit in the elbow. "Jack" continued to fire, and Davis ran. He heard "Jack" fire the gun four times.
{¶ 31} Davis ran into the woods. Bleeding badly, he hid for seven hours in the woods, waiting for dark, before returning to the road and walking until he came to a house. He arrived around 7:00 or 7:30 p.m., pale and shaking, his right elbow and pant leg bloody. The man inside, Jeffrey Schockling, called 9-1-1.
{¶ 32} While they waited, Davis, nervous, fidgety, and rambling, told Schockling that he had applied for a fencing job and that he knew they were going to rob him. Davis said he had all the documentation, all the e-mails, on the dashboard of *1043 his truck. And he said, "I knew I was in trouble when I heard the click." *502 9. November 2011: Richard Beasley
{¶ 33} In October 2011, Penny Kaufman, seeking a tenant for her Akron home, answered a Craigslist ad captioned, "Quiet man needs quiet space to live." The man who placed the ad said that his name was "Ralph Geiger" but that he went by "Dutch." He showed Kaufman a picture identification for "Ralph Geiger."
{¶ 34} "Dutch" moved into Kaufman's home on Gridley Avenue on November 1, 2011. He told Kaufman and another renter, Rick Romine, that he made extra money buying storage units and selling the contents, comparing his activity to "Storage Wars." On one occasion, he described for Romine a particular storage unit that he was hoping to buy, a unit he said contained a Cadillac, a Harley Davidson, and high-end electronics. He also told Don Walters about that storage unit.
{¶ 35} Just days after moving in, "Geiger" told Kaufman that he had won a bid on a storage unit in southern Ohio and was going to pick up the contents on November 6. He asked to store some of the items, including a flat-screen television and a Harley, in her basement. But when Kaufman came home from work on November 6, her roommate, Darlene, announced that "Dutch" "got shot at today." "Dutch" would later tell Romine that he was somewhere in southern Ohio and that
he had some stuff that he was going to sell a gentleman, and somebody's car broke down, and he was under the hood looking at the car, and he heard a click, click, click, and he turned around and hit the gun out of the guy's hand, and it hit a rock and it went off and hit the guy that got shot.
{¶ 36} "Dutch" arrived back at Kaufman's house very late that night and told her that he had been shot at. He said that when he arrived to get the storage unit's contents, two men were already there with a truck and trailer. They offered him money for the contents and kept raising their offer until he accepted. But they said he would have to follow them to their house to pick up the money. So the men loaded their trailer, and he got back in his truck and followed them.
{¶ 37} As they drove down a dirt road, the truck he was following pulled to the side and the two men got out and lifted the hood. "Dutch" said that he pulled over and walked around to see whether he could help. As he bent to look under the hood, he felt a gun to the back of his head and heard "click, click, click."
{¶ 38} "Dutch" told Kaufman that he struggled with the man and the gun fired, the bullet ricocheting and hitting one of the men in the arm. According to "Dutch," the man who had been shot ran away and the second man said to *503 "Dutch," "I have something for you." When that man started for the cab of his truck, "Dutch" ran to his own truck and drove away.
{¶ 39} Kaufman asked "Dutch" why he had not called the police. He replied, "[T]here is times you don't call the police, Penny." When she continued to press, he said that the friend who was with him at the time had a warrant out for his arrest and that he did not want to get the friend in trouble. This is the only account that "Dutch" gave in which he mentioned a companion.
{¶ 40} Beasley told Walters a similar story: other buyers offered him more for the unit, he agreed to sell to them and followed them down a country road, they pulled over, pretending to be broken down, and when he went to help, one of the men pulled a gun, which misfired. In the version *1044 he told Walters, "Dutch" claimed that he retrieved a Sawzall from his trunk and cut the man's arm before getting away.
{¶ 41} "Dutch" also described the incident to Joyce Grebelsky. She testified that he called her from southern Ohio "in distress, very upset." He said that two people had robbed him of $3,000 and put a gun to his head and that he had heard the gun click. At some point, he told Grebelsky that he had gone down to southern Ohio to buy pills. And he asked her to drive him back to southern Ohio to recover his leather coat. They went at night. He directed her down a secluded dirt road to the spot where his coat was.
{¶ 42} On November 8, "Ralph Geiger" brought a .22 Iver Johnson TP pistol to Smitty's Gun Shop for repairs. "Geiger" gave Grebelsky's address and the telephone number 245-8961 to the shop. Smitty's cleaned the gun, and it was reclaimed on November 11.
10. November 2011: The Investigation Begins
{¶ 43} Noble County Sheriff Stephen Hannum responded to the 9-1-1 call about the Davis shooting. At the scene, he spoke with Davis and found him coherent and forthcoming. Davis said that he had applied for a job with a man he met over the Internet, that the man had taken him to a remote location to look at what was supposed to be a 688-acre cattle farm, and that Davis had left his own vehicle in Caldwell because the man said the road was out and he would not be able to get his truck and trailer down the back road.
{¶ 44} Davis described two men. One was 51 or 52 years old, with dark and gray hair. The younger was 17 years old and very tall, about six feet five. Davis said that one of the men looked like he had recently shaved his beard, but Hannum was unclear which one he meant. And Davis told the sheriff that he had been shot.
{¶ 45} Sheriff Hannum did not initially believe Davis's story, in part because he was unaware of any 688-acre cattle farm in the county. He knew of only one *504 residence in the area Davis was describing: a farm in Caldwell owned by Jerry Hood Sr., who was known as "Country." And Sheriff Hannum thought that Davis's description of the two men somewhat matched Country and his son, Jerry Hood Jr., known as "County."
{¶ 46} On Don Warner Road, about a half mile from Hood's property, Hannum found the rockslide and heavy equipment Davis had described. Country's wife, Lois, worked at a local tavern, and Hannum went to see her there. Lois told him that Country was in an Akron hospital after he had fallen down stairs and cracked his skull in September 2011. While at the tavern, Hannum spoke by telephone to County, asking him whether he still had a beard. County said that he did, a fact that Hannum confirmed in person a few days later.
{¶ 47} Lois Hood testified that Country and Beasley had been friends for ten years, that Beasley was at one time married to her sister, and that he had visited their farm in Caldwell three or four times. During the time that Country was in the hospital, she said she saw Beasley around Caldwell accompanied by a young man. On one occasion, in October, they came into Lois's bar, and the young man had mud all over his arm. Lois also recalled seeing Beasley at the hospital twice, once around September 12 and again on October 24. At the hospital, he gave his telephone number to Lois as 330-256-7629.
{¶ 48} Police located Davis's truck and trailer at the Caldwell Food Emporium, where Davis said it would be. On November 8, investigators located a shallow creek intersecting Don Warner Road where they found Davis's black leather ball cap.
*1045 11. November 2011: Tim Kern
{¶ 49} Tim Kern was divorced and the father of three boys. Around October or November of 2011, he was working part-time at a gas station and was either staying at a friend's house or living in his car. Despite his troubles, he visited his boys every day.
{¶ 50} Kern's ex-wife, Tina Kern, and son, Nicholas Kern, both testified that Kern was looking for jobs on Craigslist. On October 10, 2011, Kern responded to a Craigslist ad for a farm caretaker. Nicholas drove his father to a job interview at a Waffle House off Interstate 77 on November 9.
{¶ 51} Security video from the Waffle House shows Kern meeting for about a half hour with a man who resembles Beasley. A few days later, Kern told Nicholas that he got the job, that it was in Cambridge, and that he planned to leave right away.
{¶ 52} Kern left on November 13. The night before, Tina notarized a transfer of title for his Buick, because Tim said he had to title his car in his employer's *505 name. The employer's name was not added to the transfer. Tina and Nicholas never saw Kern again.
12. November 2011: Richard Beasley
{¶ 53} Beasley asked Don Walters for help with a broken-down Buick he said he had bought. The two men drove to Canton, where the Buick was parked at a sandwich shop. In the glove box, Walters found a vehicle registration in the name of Kern. Beasley gave the Buick's title to Walters, asking him to scrap the vehicle using his own name and identification. Beasley told Walters that he had a farm in Noble County, and he invited Walters to see the farm after he scrapped the Buick.
{¶ 54} On November 15, Beasley left four voicemail messages on Walters's phone, imploring Walters to help him move the car before it was towed. Walters testified that Beasley was calling about the Buick and its title. At trial, Walters identified photographs of the Buick. Tina Kern identified those same photographs as her ex-husband's Buick.
13. November 2011: The Investigation Concludes
{¶ 55} On November 14, FBI agents and local law enforcement returned to the scene of the Davis shooting to search the woods. An empty, hand-dug hole, about 80 inches long and a couple feet deep was found approximately 175 feet from the road. An agent with the Bureau of Criminal Identification and Investigation ("BCI"), Steven Burke, testified that his first impression on seeing the hole was that it was a grave. The hole was 100 to 150 feet from where Davis's hat had been found earlier.
{¶ 56} The next day, search dogs alerted investigators to an area of disturbed soil. Below, they found David Pauley's mostly naked body. On November 25, roughly 80 feet from the open unused grave, searchers found another shallow grave containing Ralph Geiger's naked body.
{¶ 57} On November 15, Bais told investigators that his girlfriend had found a note at their house to call "Dutch;" the note gave a telephone number of 330-245-8961. Based on cellular-tower data, police determined that the phone associated with that number was last used near Gridley Avenue. Investigators independently tracked Beasley to Gridley Avenue through his Craigslist correspondence with Kaufman.
{¶ 58} Officers arrested Beasley on November 16 and executed a search warrant at the Kaufman residence on Gridley. Among the items in Beasley's bedroom was a collection of NASCAR trading cards, an ammunition box, and a green cooler containing a model train and books on *1046 trains, all of which had belonged to David Pauley. Agents also found mail there addressed to "Ralph *506 Geiger," including an envelope from PNC Bank dated September 30, 2011. They found a receipt for emergency medical services provided to Ralph Geiger on February 25, 2011. And they recovered four prescription pill bottles with Geiger's name on them and two pill bottles with Beasley's name on them.
{¶ 59} After Beasley's arrest, Joyce Grebelsky received a letter addressed to "Joyce Grebowski," a misspelling seen in one of the "Ralph Geiger" job applications. The return address identified the sender as "Chris Star" in the Summit County Jail. Grebelsky did not know a "Chris Star." She believed the letter was from Beasley. Inside were a three-page handwritten letter and a map. The letter read:
Joyce,
Get your truck from Reeves & scrap it. Keep $100 and put the rest on my books.
I need for you to go to the Gridley house where I lived at night and go into the back yard, in the rear corner by the garage under some leaves is 2 laptop cptrs, get them & destroy them, then take them apart and trash them.
In the front corner of the backyard, between the house & drive is a wallett under leaves, get that wallett & destroy the contents, if there are $ left its yours.
Do not tell anyone about this & never even hint on a phone, write me a letter & use the phrase "sunny day" if it goes allright, or "rainy day" if the cptrs are gone, I might be able to call you by T-Day, If so, you can say the code words on the phone, If you haven't got it yet, just say "average day."
It is very important this gets done, I mean, critical.
* * *
[HAND-DRAWN MAP]
Look forward to a good report, will write soon,
R
The map showed a house and backyard, with an X by the garage labeled "cptr" and a second X labeled "wallet."
{¶ 60} Grebelsky contacted authorities about the letter on November 25, 2011. After receiving Penny Kaufman's consent to search the premises on Gridley Avenue, FBI agents found a wallet containing a driver's license, Social Security card, birth certificate, and other personal documents in the name of Ralph Geiger under a downspout in the northwest corner of the property. And in the southwest *507 corner, under a pile of leaves, they found an Acer laptop computer and a Dell laptop computer.
{¶ 61} BCI computer-forensic specialist Allan Buxton examined the laptops. On the hard drive of the Acer he found a deleted account in the name of Rick Pauley (David's brother) as well as documents authored by Rick Pauley.
{¶ 62} The Dell computer and a computer taken from Joe Bais's home had both been used to access the rohandannaher@gmail.com e-mail account with a password. And in the Dell's browser history, Buxton located the text of an ad offering a handyman job on a secluded property in Ohio. The ad appeared on a website, Akron-Canton.backpage.com, on November 1, 2011. The e-mail address that placed the ad was wassalovpoplivitch@hotmail.com. All outgoing traffic from wassalovpoplivitch@hotmail.com ceased when Beasley was arrested. The Acer computer had also been used to access that e-mail account.
*1047 {¶ 63} On November 25, agents and a cadaver dog located Tim Kern's body, fully clothed, in a shallow pit in a wooded area near a vacant Summit County mall. Kern's driver's license and Social Security card were found on his body.
{¶ 64} Licking County Deputy Coroner and Chief Pathologist Charles Jeffrey Lee performed autopsies on David Pauley's and Ralph Geiger's bodies. Dr. Lee testified that Pauley and Geiger were each killed by a single gunshot to the head. Dr. Lee estimated that Pauley had been dead two to three weeks, but he could not be certain.
{¶ 65} Summit County Chief Medical Examiner Lisa Kohler performed an autopsy on Kern's body. Dr. Kohler determined that he suffered five gunshot wounds to the head.
{¶ 66} Law-enforcement officers arrested Brogan Rafferty on November 16. They searched his bedroom and found a briefcase containing, among other items, a sawed-off shotgun, an Iver Johnson .22 long rifle semiautomatic pistol, a box of ammunition, and some loose shotgun shells. According to ballistics expert Jonathan Gardner, the bullets recovered from Kern's body could have been fired by the Iver Johnson pistol but he could not conclusively say that they were.
{¶ 67} However, the Iver Johnson pistol was not used to shoot the other victims. Scott Davis was shot with a .32 caliber bullet, most likely fired from a revolver. The bullet that killed Ralph Geiger was a .38 caliber bullet. The bullet recovered from Pauley was an intermediate caliber, either .32 or .38. Gardner testified that the bullet recovered from Pauley's body was not fired by the Iver Johnson or by the same weapon that killed Geiger, but he could not exclude the possibility that the same weapon was used to shoot Davis and Pauley. In Gardner's opinion, therefore, a minimum of three guns were used in the crimes.
*508 {¶ 68} When he was arrested, Beasley was carrying a phone that had been activated on November 9, just days after the Davis shooting. This phone was not the same one authorities used to track his location to Gridley Avenue. In Beasley's room at Gridley Avenue, they found two more cellphones, one of which was first activated on October 30.
{¶ 69} Investigators linked five other prepaid cellphones to the crimes, none of which was ever recovered.
14. Cellphones
a. The prepaid 4914 phone
{¶ 70} TracFone is a prepaid cellphone service. On July 30, 2011, an unknown subscriber activated the phone number 330-289-4914 (the "4914 phone") through TracFone. The phone was last used on September 3, 2011.
{¶ 71} During the four weeks it was used, there were calls between the 4914 phone and phones used by Geiger, Rafferty, Walters, and Bais. On August 7, the day before Geiger left for Caldwell, his phone received a call from the 4914 phone. Between August 7 and 9, there were ten calls between the 4914 phone and Rafferty's cellphone. On the night of August 8 and into the early hours of August 9, 2011, while Geiger and two other men were checked in at the Caldwell Best Western, six calls were placed from the 4914 phone that originated in close proximity to that hotel.
b. The prepaid 7629 phone
{¶ 72} When Beasley visited Country Hood in the hospital, he told Lois Hood that his phone number was 330-256-7629 (the "7629 phone"). That number matched a prepaid phone that was activated on October 4, 2011. Phone records documented calls between the 7629 phone and *1048 phones used by Walters, Grebelsky, and Rafferty. It was also the contact number for the Craigslist ads posted from Joe Bais's computer using the e-mail address rohandannaher@gmail.com. And Davis, Dan DeWalt, George Brown, Kern, and Pauley all sent e-mails to rohandannaher@gmail.com responding to the Craigslist ad for a farm caretaker.
c. The prepaid 1804 phone
{¶ 73} A prepaid phone with the number 330-310-1804 (the "1804 phone") was first activated on August 30, 2010. Phone calls from the 1804 phone were placed to the phones of Pauley, Davis, and Rafferty. Phone records show that on October 21, 22, and 23, while Pauley was traveling to Ohio, four calls occurred between Pauley's phone and the 1804 phone. And on October 23, the day that Pauley disappeared, a call occurred between his phone and the 1804 phone when both devices were in the Marietta area.
*509 {¶ 74} Beginning on October 27, there were multiple calls between the 1804 phone and Scott Davis's cellphone. The last outgoing call on the 1804 phone was to Davis's phone on the morning that Davis was shot.
d. The prepaid 8961 phone
{¶ 75} A prepaid phone with the number 330-245-8961 (the "8961 phone") was activated on August 3, 2011. Six voicemail messages that were left for Walters from Beasley came from this number. Walters identified that number as belonging to "Dutch." It was also the contact number placed on the gun tag at Smitty's Gun Shop. A call was placed from the 8961 phone to Smitty's on November 10, 2011, four days after the attempted murder of Davis.
{¶ 76} In the days surrounding Pauley's death (October 21 through 23), there were ten contacts between the 8961 phone and Rafferty's phone. On October 22, the night before Pauley disappeared, the 8961 phone was in an area east of Akron, as determined by the cellphone towers activated by its use. On the following afternoon, it was in Guernsey County, directly north of Noble County, where Pauley was killed, and appeared to be traveling north.
{¶ 77} There were also calls between the 8961 phone and Rafferty's phone in the days leading up to Kern's death, November 8 through 13. On the day that Kern disappeared, a call was placed from the 8961 phone to Rafferty's cellphone at 5:23 a.m.
e. The prepaid 5353 phone
{¶ 78} A prepaid phone with the number 234-738-5353 (the "5353 phone") was activated on November 6, 2011. The subscriber listed for the 5353 phone was Jack Bell, One Main Street, Akron. The owner of the office building at that address did not recall anyone by that name working there.
{¶ 79} Between November 8 and 13, multiple contacts occurred between the 5353 phone and Tim Kern's cellphone. At 11:15 a.m. on November 9, a call was placed from the 5353 phone in the vicinity of the Waffle House near Interstate 77 at the precise moment that the Waffle House's surveillance video showed Beasley placing a call. After a call to Kern was placed from the 5353 phone on the morning of November 13, the 5353 phone was never used again to make an outgoing call.
B. The Defense's Case
{¶ 80} The defense presented testimony from Beasley and three other witnesses.
{¶ 81} Beasley testified that about 30 years before the trial, he was convicted of burglary in Texas. He was sentenced to a four-year prison term but was released on parole in 1989, at which time he moved to Akron. He later served time in *510 federal prison for a weapon-possession charge and again returned to Akron after he was released on parole. *1049 {¶ 82} According to Beasley, his Texas parole officer contacted him in January 2011, even though his reporting obligation had ended. The parole officer said he would have to start reporting again and "insinuated heavily" that Beasley was going to be "violated" and returned to Texas. To avoid returning to Texas, Beasley testified, he decided to change his identity.
{¶ 83} Beasley testified that he knew Ralph Geiger from the Brothers Motorcycle Gang clubhouse. He claimed that he told Geiger of his plan to change his identity, that Geiger offered to help, and that Geiger had two driver's licenses but gave one to Beasley, along with his Social Security card. Beasley confirmed telling Grebelsky of his plan to take Geiger's identity.
{¶ 84} According to Beasley, after he assumed Geiger's identity, he needed medical care, so Geiger gave him copies of some medical paperwork in Geiger's name. Beasley claimed to have first used Geiger's name at Akron Community Health on January 28, 2011, months before Geiger's death. During his first visit, he saw a nurse practitioner named Lisa Thayer. He returned to the clinic twice in September 2011, at which time Dr. Moreno prescribed pain medication for him. A document with the logo of Akron Community Health, dated May 14, 2012, and addressed to "Ralph Geiger" at Grebelsky's Cramer Avenue address, listed three visits and indicated that Thayer had provided treatment during the first visit in January 2011.
{¶ 85} The patient summary for Ralph Geiger printed from Akron Community Health's records included a photograph of the patient. Dr. Moreno testified that the man in the photograph was the patient she knew as "Ralph Geiger." Beasley suggested that the photograph must have been taken in January, when he first became a patient. Dr. Moreno agreed that the picture "should have been" taken in January, but she did not know whether that was the case. She did recognize the hat and shirt worn in the picture as those the patient wore during his visit on September 20.
{¶ 86} Beasley testified that as part of his new identity, he had to move frequently. He lived with Grebelsky and then with Joe Bais about two months before moving into Kaufman's home on November 1, 2011.
{¶ 87} Beasley testified that he last saw Geiger in late July or early August, when Geiger said he planned to go to the Hood farm to work on a project. Country Hood was the international president of the Brothers Motorcycle Gang, which Beasley described as a "violent organization." And he testified that Brogan Rafferty's father was the national president of the North Coast Motorcycle Gang, an equally violent gang.
*511 {¶ 88} Beasley testified that after Country's accident, the Hood family lived mostly in Akron to be close to the hospital. According to Beasley, County Hood said that his father might never live on the farm again, so he and County used Bais's computer to post an on-line ad for a farm caretaker. Beasley said that he interviewed the candidates, because County, inarticulate and sporting a two-foot beard, would not make a good impression and because County wanted to spend his time at the hospital with his father. When interviewing, Beasley used the name "Jack" because he did not want to risk being recognized or jeopardize his "Ralph Geiger" identity. Beasley testified that after conducting an interview, he would give the information to County and would have nothing further to do with the hiring.
{¶ 89} Beasley testified that Scott Davis was the only candidate with whom he personally followed up or traveled to Caldwell to meet. He claimed that he drove to Caldwell at County's urging. He and Rafferty drove together and met Davis at the Shoney's.
*1050 The three rode in the same car to the Hood property. But after they looked at the farm, instead of heading back to town, Rafferty, who was driving, turned left down Don Warner Road.
{¶ 90} When they reached the place where the road was blocked, Beasley claims he and Davis got out so Rafferty could turn the car around. After Rafferty drove off down the hill, Davis pointed a revolver at Beasley's head. Beasley asked, "Why?" and Davis replied, "Brother, you are a weak link." Beasley understood this to mean that Davis knew he was an informant.
{¶ 91} In fact, Beasley testified, he was an informant. He claimed to have been giving information about motorcycle gangs to two police officers. But one time, while at police headquarters, he ran into someone he knew, a prostitute and drug addict named Kimberly Burd. Because he was talking to the officer who had just arrested Burd, Beasley thought she might have realized, and told the gang, that he was informing.
{¶ 92} Beasley testified that Davis fired the gun three times but that it misfired. He fled into the woods, and Davis gave chase. They struggled and the gun went off, striking Davis in the arm, which allowed Beasley to escape.
{¶ 93} Beasley admitted that he was at the U-Haul rental office but claimed that he was just tagging along with Don Walters. He said he had received property from Walters, not the other way around.
{¶ 94} Finally, Beasley admitted meeting Kern at the Waffle House. He said that Rafferty had left the 5353 cellphone in his truck and that when Kern called it, he (Beasley) answered. He decided to meet with Kern to tell him not to go to the farm, but Kern was insistent because he needed money.
*512 {¶ 95} Beasley denied hiding the wallet and computers at the Gridley Avenue house. He claimed that Rafferty had the laptops and that he last saw the wallet containing Geiger's identification in the glove box of his truck the day before he was arrested.
{¶ 96} After his testimony concluded, Beasley called Michelle Snyder, a BCI fingerprint expert, as a witness. She testified that she did not identify Beasley's fingerprints as any of the prints lifted from the vehicles of Rafferty, Pauley, or Kern.
{¶ 97} Next, he called Akron Detective Keith Meadows, who testified that he was assigned to the gang unit and was familiar with both the Brothers and North Coast gangs. He confirmed that Beasley had been a confidential informant for four or five months beginning in August 2010 and that in January 2011, Beasley had expressed concern that his contacts with police were becoming known. On cross-examination, Meadows stated that he had never heard the names Ralph Geiger or Scott Davis associated with the Brothers gang.
{¶ 98} Last, Beasley called Akron Police Lieutenant Brian Simcox, who testified that he had learned that a gang wanted to know his home address. This made him uneasy, because he took it as a threat that something might happen to him.
C. The State's Rebuttal Case
{¶ 99} The state called three witnesses in rebuttal: County Hood, William Bennett, and Heather McPherson.
{¶ 100} County confirmed that his family owned property in Noble County, adjacent to an old strip-mine site. (At least one of the victim's bodies was found on the coal company's land.) The Hood property had once been an operating cattle farm, but County testified that it no longer was.
{¶ 101} County testified that he had known Beasley for about 15 years, from *1051 when Beasley was in prison with his father. Beasley went to Akron General Hospital to visit the father three or four times, and during one visit, County and Lois had given Beasley their cellphone numbers. County identified his and his mother's cellphone numbers written on a PNC Bank envelope that had been seized from Beasley's room.
{¶ 102} County denied asking Beasley to help him hire anyone to care for the farm or to post a Craigslist ad. He never borrowed Beasley's truck or phone. He testified that he did not know Bais, Walters, Geiger, or Pauley. He had heard the names Brogan Rafferty, Tim Kern, and Scott Davis, but he did not know them.
{¶ 103} Next, William Bennett testified as a handwriting expert. Bennett testified that Beasley wrote the name, address, city, and telephone number on the gun slip for Smitty's Gun Shop. And he opined that the person who wrote the *513 Waltco application also wrote the letter to Joyce Grebelsky. He expressly opined that Beasley wrote the Grebelsky letter.
{¶ 104} The final witness was Heather McPherson, a booking officer at the Summit County Jail. She testified that Beasley was an inmate from February 9, 2011, until July 13, 2011. And she identified photographs of Beasley, taken February 9, 2011, in which he had a full, gray beard.
D. Procedural History
{¶ 105} The Summit County Grand Jury returned a 27-count indictment against Beasley. The first three counts related to Ralph Geiger's death and charged Beasley in Count 1 with aggravated murder with prior calculation and design ( R.C. 2903.01(A) ), in Count 2 with felony aggravated murder based on aggravated robbery ( R.C. 2903.01(B) ), and in Count 3 with felony aggravated murder based on kidnapping ( R.C. 2903.01(B) ). Each aggravated-murder count included two death-penalty specifications under R.C. 2929.04(A)(7), alleging that Beasley committed the murder in the course of committing aggravated robbery and kidnapping. In addition, each aggravated-murder count included death-penalty specifications for murder as a part of a course of conduct ( R.C. 2929.04(A)(5) ) and while at large having broken detention ( R.C. 2929.04(A)(4) ) as well as a firearm specification ( R.C. 2941.145 ).
{¶ 106} Counts 4, 5, and 6 similarly charged Beasley with three aggravated-murder counts for the death of David Pauley, with the same specifications. Counts 7, 8, and 9 repeated the same charges and specifications for the death of Tim Kern.
{¶ 107} The indictment also charged Beasley with attempted murder ( R.C. 2903.02(A) and 2923.02 ), with a firearm specification (Count 10); four counts of aggravated robbery ( R.C. 2911.01(A)(1) and (3) ), with firearm specifications (Counts 11, 12, 13, and 14); four counts of kidnapping ( R.C. 2905.01(A)(2) ), with firearm specifications (Counts 15, 16, 17, and 18); four counts of having a weapon under disability ( R.C. 2923.13(A)(1) and (2) ) (Counts 19, 20, 21, and 22); identity fraud ( R.C. 2913.49(B)(1) ) (Count 23); two counts of grand theft ( R.C. 2913.02(A)(1) ) (Counts 24 and 25); and two misdemeanor counts of petty theft ( R.C. 2913.02(A)(1) ) (Counts 26 and 27).
{¶ 108} After the state rested its case-in-chief, the trial court granted a defense motion for acquittal as to Count 25, which had charged Beasley with grand theft for stealing a firearm from Pauley. The jury unanimously convicted Beasley on all remaining counts and almost all the specifications. With respect to the felony-murder specifications, the state had charged Beasley both as the principal offender and for acting with prior calculation and design. R.C. 2929.04(A)(7). The jury found Beasley not guilty of being the principal offender *1052 but guilty of acting *514 with prior calculation and design in the aggravated murder of Tim Kern (specifications 3 and 4 to Counts 7, 8, and 9).
{¶ 109} The state merged the aggravated-murder charges into the prior-calculation-and-design aggravated-murder charge before the sentencing phase began, so, for purposes of capital sentencing, the jury considered only Counts 1, 4, and 7. The jury unanimously recommended a sentence of death on each of the three counts. The trial court accepted the recommendations and imposed three death sentences. In addition, the trial court imposed a three-year prison sentence on each capital count for the firearm specification.
{¶ 110} For the attempted murder of Scott Davis (Count 10), the court imposed a prison sentence of ten years, plus three years for the firearm specification. The court also sentenced Beasley to six years for the aggravated robbery of Davis (Count 13) and eight years for the kidnapping of Davis (Count 17), merging both firearm specifications. On the weapon-under-disability charges (Counts 19 through 22), the court sentenced Beasley to four two-year terms, to be served consecutively. The identity-fraud conviction (Count 23) resulted in a maximum sentence of one year. The remaining counts and specifications all merged. The court ordered the sentences on all the noncapital convictions to run consecutively. In addition, the sentencing entry imposed court costs upon Beasley.
{¶ 111} Beasley now appeals, raising 11 propositions of law. We will address them in roughly the order in which they arose at trial.
II. ANALYSIS
A. Proposition of Law No. 2: Change of Venue
{¶ 112} In proposition of law No. 2, Beasley asserts that his constitutional rights were violated by the trial court's denial of a motion to change venue. We will not disturb a trial court's decision on a venue motion unless the trial court abused its discretion. State v. Roberts , 110 Ohio St.3d 71, 2006-Ohio-3665, 850 N.E.2d 1168, ¶ 116.
{¶ 113} Prior to trial, Beasley sought a venue change, alleging that "extensive and ongoing pretrial publicity [has made] it presumptively impossible to seat an impartial jury in" Summit County. Beasley did not attach any evidence to the motion or present any at the motions hearing. The court elected to hold the motion in abeyance, stating that it "shall be reconsidered in the event the voir dire process suggests an inability to seat an impartial jury." Beasley did not renew the motion, and the trial court did not address it again.
{¶ 114} Allegations that pretrial publicity deprived a defendant of a fair trial fall into two categories. Generally, a defendant must demonstrate that one or more jurors was actually biased.
*515 State v. Treesh , 90 Ohio St.3d 460, 464, 739 N.E.2d 749 (2001). Beasley has not identified any particular juror(s) who might have been biased by exposure to pretrial publicity, nor has he cited any specific section of the voir dire transcript as evidence that a fair trial was impossible.
{¶ 115} In "certain rare cases," pretrial publicity can be so damaging that prejudice must be conclusively presumed even without a showing of actual bias. State v. Mammone , 139 Ohio St.3d 467, 2014-Ohio-1942, 13 N.E.3d 1051, ¶ 56. To prevail on a claim of presumed prejudice, the defendant must make " 'a clear and manifest showing * * * that pretrial publicity was so pervasive and prejudicial that an attempt to seat a jury would be a vain act.' " (Ellipsis sic.) Id. , quoting State v. Herring , 21 Ohio App.3d 18, 486 N.E.2d 119 (9th Dist.1984), syllabus. Relevant factors *1053 include, but are not limited to, the size and characteristics of the community in which the crime occurred, whether media coverage about the defendant contained blatantly prejudicial information that readers or viewers could not reasonably be expected to ignore, and whether media coverage lessened with the passage of time. Mammone at ¶ 59.
{¶ 116} Beasley presented no evidence of the amount or quality of pretrial media or social-media coverage of the case. He essentially asks us to presume that the coverage was prejudicial to him. Beasley has not satisfied his high burden of proof to show that the trial judge abused her discretion. We reject proposition of law No. 1.
B. Proposition of Law Nos. 3(A) and 7(D)(1)(a): Prosecutorial Misconduct
{¶ 117} In his third proposition of law, Beasley asserts prosecutorial misconduct in the state's opening statement. The prosecutor began her opening statement to the jury by stating:
So, ladies and gentlemen, in preparing this opening statement I tried my best to think of a word or phrase that best describes the defendant, Richard Beasley. And the phrase that kept echoing in my mind after reviewing everything and preparing for this case was a wolf in sheep's clothing.
I wanted to be sure before I put this in front of everybody that I truly understood what the wolf in sheep's clothing means. So we probably used it at some point in our lives. So I did a little bit of research.
As it turns out, the phrase originates from a sermon by Jesus reporting to Christians who * * *.
*516 At that point, defense counsel objected. The record suggests that while she was speaking, the prosecutor put the complete quotation from the Gospel of Matthew[1] on the display screen for the jury to see.
{¶ 118} Outside the hearing of the jury, the court sustained the objection to the biblical reference. The judge told the state to take down the visual aid and ordered the state not to read the quotation from the Gospel of Matthew. However, she overruled Beasley's objection to the phrase "wolf in sheep's clothing." When the jury returned, the trial judge gave a limiting instruction:
Ladies and gentlemen, there have been some-you have seen some things up on the screen, there is not going to be reference to that right now. You are instructed to disregard anything that you saw or read.
And, once again, what you are hearing now is not evidence in this case, but I am still instructing you to disregard it.
The prosecutor continued her opening statement without further reference to the biblical passage.
{¶ 119} The test for prosecutorial misconduct is whether the prosecutor's remarks were improper and, if so, whether they prejudicially affected a substantial right of the accused. State v. White , 82 Ohio St.3d 16, 22, 693 N.E.2d 772 (1998). "The benchmark of the prosecutorial misconduct analysis is 'the fairness of the trial, not the culpability of the prosecutor.' "
*1054 State v. Obermiller , 147 Ohio St.3d 175, 2016-Ohio-1594, 63 N.E.3d 93, ¶ 99, quoting Smith v. Phillips , 455 U.S. 209, 219, 102 S.Ct. 940, 71 L.Ed.2d 78 (1982).
{¶ 120} "During opening statement, counsel is accorded latitude and allowed fair comment on the facts to be presented at trial." State v. Leonard , 104 Ohio St.3d 54, 2004-Ohio-6235, 818 N.E.2d 229, ¶ 157. In this case, the prosecutor used the "wolf in sheep's clothing" trope to make the point that Beasley lured his victims by pretending to offer them jobs, which constitutes "fair comment" on the evidence. See State v. Diar , 120 Ohio St.3d 460, 2008-Ohio-6266, 900 N.E.2d 565, ¶ 146-147 (prosecutor's invocation, during an arson trial, of the appearance of the survivors of the September 11, 2001 terrorist attack on the World Trade Center was fair comment to make the point that the defendant's clean clothing belied her claim to have searched the burning home for her son).
{¶ 121} With respect to the visual aid, the court sustained the objection and instructed the jury to disregard what they had seen, thereby curing any *517 prejudice, see State v. Lang , 129 Ohio St.3d 512, 2011-Ohio-4215, 954 N.E.2d 596, ¶ 168.
{¶ 122} Beasley contends that the specific remarks in question are uniquely prejudicial because they invoke the Bible. Courts have found biblical quotations to be inappropriate when used to exhort the jury to return a specific verdict. For example, calling a defendant "the evil one" and invoking the Lord's Prayer is inappropriate in a sentencing proceeding because doing so "can create the inference that the death penalty is mandatory through their appeal to a higher authority, and * * * allow a jury to delegate its own responsibility for the imposition of the sentence." Cauthern v. Colson , 736 F.3d 465, 476-477 (6th Cir.2013). But no court has imposed a blanket prohibition on biblical quotations in the courtroom.
{¶ 123} In the context of the entire trial, the prosecutor's isolated remark did not substantially impair Beasley's right to a fair trial. See State v. Tibbetts , 92 Ohio St.3d 146, 168-169, 749 N.E.2d 226 (2001) (holding that one isolated remark in closing argument, comparing the alleged crime to a mafia hit, did not deprive the defendant of a fair trial). We reject this proposition of law.
{¶ 124} In proposition of law No. 7(D)(1)(a), Beasley asserts that his trial counsel provided ineffective representation when they failed to seek a more specific limiting instruction following the prosecutor's opening statement. Given the foregoing analysis, this proposition also has no merit.
C. Proposition of Law Nos. 3(B), 4, and 7(C)(1): Juror Bias
{¶ 125} On the fourth day of testimony, investigator Michael Daugherty testified that his supervisor in the investigation was Todd Wickerham, an FBI agent. At the lunch break, juror No. 5 came forward to say that he knew Wickerham. Juror No. 5 told the judge and counsel that his daughter and Wickerham's daughter were very good friends and that over the last month and a half, he and Wickerham had become friends. The two played pick-up basketball together, and juror No. 5 knew Wickerham's wife and daughters. But juror No. 5 indicated that prior to trial, he did not know that Wickerham was an FBI agent.
{¶ 126} Defense counsel asked juror No. 5 whether he would feel he had to justify to Wickerham any verdict that the jury might return, and juror No. 5 said he would not. Defense counsel then indicated that the defense was "satisfied." The court and juror No. 5 then had the following colloquy:
*1055 The Court: You know him, is his testimony going to be more credible to you or can you treat him like any of the other witnesses and evaluate it, you know, person by person?
*518 Juror No. 5: I don't know. I can't answer that question until I hear his testimony, to tell you the truth.
The state's attorney and defense counsel agreed that Wickerham would not testify to facts in dispute and thus that the jury would never have to assess his credibility against that of a defense witness. For that reason, defense counsel said that they did not want to excuse juror No. 5. During this exchange, the court and counsel did not directly ask juror No. 5 whether he could be fair and impartial.
{¶ 127} Based on these facts, Beasley asserts that permitting juror No. 5 to remain on the panel deprived him of his constitutional rights to a fair trial and impartial jury. In three overlapping propositions of law, he suggests that someone -the trial court, the prosecution, or the defense attorneys-breached a legal duty to challenge juror No. 5 and remove him from the panel.
{¶ 128} In proposition of law No. 4, Beasley asserts that the trial court infringed upon his rights under both the United States and Ohio Constitutions to have a fair and impartial jury by "allow[ing] a biased juror to sit on his capital jury." But the mere fact that juror No. 5 was acquainted with a witness does not establish disqualifying bias. " 'There is no constitutional prohibition against jurors simply knowing the parties involved or having knowledge of the case.' " State v. Hale , 119 Ohio St.3d 118, 2008-Ohio-3426, 892 N.E.2d 864, ¶ 208, quoting McQueen v. Scroggy , 99 F.3d 1302, 1320 (6th Cir.1996). A juror is permitted to serve so long as her relationship to a person in the case is distant and casual, rather than close and ongoing. Id. Beasley has not demonstrated that juror No. 5 and Wickerham had such a particularly close or intimate relationship that it would give rise to a presumption of bias.
{¶ 129} Instead, Beasley argues that the proof of juror No. 5's partiality was in his equivocal response to the judge's question whether he could evaluate Wickerham's testimony the same as all the other witnesses: "I don't know. I can't answer that question until I hear his testimony, to tell you the truth." Beasley contends that after hearing that statement, the trial court had a duty to ask follow-up questions before allowing him to remain on the jury. But the cases he cites do not impose an affirmative duty on trial courts to voir dire witnesses in this situation.
{¶ 130} Rather, a Sixth Circuit Court of Appeals opinion cited by Beasley has noted that when a prospective juror reveals bias and there is no attempt to rehabilitate her, then evidence of bias in the record is unrefuted and unambiguous. Hughes v. United States , 258 F.3d 453, 459-460 (6th Cir.2001).
{¶ 131} The question this case presents, then, is whether juror No. 5's response to the judge's question is a sufficient admission of bias to disqualify him from service. In the cases Beasley cites, the admission of partiality was unmistakable.
*519 See Miller v. Webb , 385 F.3d 666, 678 (6th Cir.2004) (prospective juror said she was "partial" to the alleged victim and "had sympathy for her"); Hughes at 456-457 (prospective juror stated that she did not think she could be fair). Juror No. 5's response did not convey the same level of equivocation about his fundamental ability to be impartial. See United States v. Umana , 750 F.3d 320, 341 (4th Cir.2014) (holding that "[a] juror need not express unflinching certainty for a trial judge to determine that she will be able to remain impartial").
*1056 {¶ 132} Juror No. 5's response was ambiguous. See State v. Burkhart , 7th Dist. Belmont No. 80-B-11, 1981 WL 4785, *3 (Sept. 22, 1981) (no evidence of bias when juror's answer could be read two ways). Beasley reads juror No. 5's response as an admission of his likelihood to overvalue Wickerham's testimony. But it can also be read as an assurance that Wickerham's credibility in juror No. 5's eyes would depend on how he comported himself on the stand and that until he heard the testimony, juror No. 5 would remain open-minded. This lone statement did not establish actual bias on the part of juror No. 5. See United States v. Mitchell , 568 F.3d 1147, 1152-1153 (9th Cir.2009) (juror who stated that her uncle's death would "affect her" was not specifically asked how it would affect her or whether it would prevent her from being impartial).
{¶ 133} Alternatively, Beasley asserts that his counsel were ineffective for not challenging juror No. 5 for cause. "Absent the showing of a strategic decision, failure to request the removal of a biased juror can constitute ineffective assistance of counsel." Johnson v. Armontrout , 961 F.2d 748, 755 (8th Cir.1992). But here again, Beasley's claim fails for lack of evidence that juror No. 5 was actually biased.
{¶ 134} Next, Beasley presents two theories of prosecutorial misconduct arising out of the seating of juror No. 5 on the panel. One theory appears in Beasley's reply brief, wherein he accuses the state of misconduct for failing to conduct further inquiry as to juror No. 5's possible bias. He cites no authority for the proposition that the state has an affirmative duty to ferret out bias in the jury panel, much less that the state's failure to do so constitutes misconduct.
{¶ 135} The second theory is that the prosecution engaged in misconduct by falsely representing to the court and defense counsel that Wickerham's credibility would not be in dispute (proposition of law No. 3(B) ). But the state's representation was truthful: Wickerham did not testify to facts in dispute.
{¶ 136} As an example, Beasley complains that Wickerham was the investigator who obtained the surveillance photo from the Shoney's where Beasley and Rafferty met Davis. But Wickerham's testimony merely established the chain of custody. The authenticity of the videotape was not in dispute, and in fact, Beasley admitted meeting Davis and Rafferty at the restaurant.
*520 {¶ 137} Likewise, Wickerham's testimony about interviewing Joe Bais and about the searches of Beasley's room and truck that led to the discovery of paperwork and medications with Ralph Geiger's name on them established the steps taken by investigators, without presenting any facts disputed by the defense. And his testimony connecting Beasley to the 8961 phone was confirmed by other witnesses, including Beasley himself. Thus, Beasley has not demonstrated a false representation by the prosecutors.
{¶ 138} Beasley's assertion that "if Wickerham was not going to testify about any facts in dispute, his testimony was not relevant to Beasley's case and should have been inadmissible" is not convincing. Absent a stipulation, the state has the burden of proving even the facts that are not in dispute. Witnesses, be they record custodians or eyewitnesses, often testify to uncontroverted facts at trial.
{¶ 139} We reject proposition of law Nos. 3(B), 4, and 7(C)(1).
D. Proposition of Law No. 7: Ineffective Assistance of Counsel
{¶ 140} To prove an allegation of ineffective assistance of counsel, a defendant must satisfy a two-pronged test.
*1057 Strickland v. Washington , 466 U.S. 668, 687, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). First, he must establish that counsel's performance fell below an objective standard of reasonable representation. Id. And second, he must show that he was prejudiced by the deficient performance. Id. A defendant can establish prejudice by showing that but for counsel's errors, there exists a reasonable probability that the result of the trial would have been different. State v. Bradley , 42 Ohio St.3d 136, 538 N.E.2d 373 (1989), paragraph three of the syllabus.
1. Defective Waiver of Beasley's Right to be Present (Proposition of Law No. 7(A) )
{¶ 141} The accused has a fundamental right to be present at all critical stages of his criminal trial. State v. Brinkley , 105 Ohio St.3d 231, 2005-Ohio-1507, 824 N.E.2d 959, ¶ 117 ; Ohio Constitution, Article I, Section 10 ; Crim.R. 43(A). In this proposition of law, Beasley alleges that his counsel were ineffective for failing to get a proper waiver of his right to be present at various points in the proceedings.
{¶ 142} Six times, the court conducted proceedings without Beasley present: a pretrial conference in chambers to review pending motions, the first day of group voir dire, a conference in chambers to discuss the dismissal of an alternate juror, proceedings outside the presence of the jury to move for the admission of exhibits, a discussion outside the presence of the jury to discuss jury instructions and verdict forms, and a session in court to answer a question from the jury *521 during deliberations. In each instance, Beasley's counsel expressly waived his right to be present.
{¶ 143} Counsel is permitted to waive the client's right to be present. Brinkley at ¶ 122 ("Even if we were to assume that Brinkley was absent from the unrecorded in-chambers or bench conferences, counsel could have waived his presence"); State v. Green , 90 Ohio St.3d 352, 372, 738 N.E.2d 1208 (2000) (counsel can waive a client's presence without an express waiver from the defendant on the record). And even if the waiver were ineffective, Beasley has failed to even allege that his absence prejudiced him. See State v. McKnight , 107 Ohio St.3d 101, 2005-Ohio-6046, 837 N.E.2d 315, ¶ 215 (holding that defendant was not prejudiced by his absence when "the conferences mostly involved legal issues within the professional competence of counsel, not issues that appellant must personally decide").
{¶ 144} Alternatively, Beasley cites two moments in the proceedings when the record is silent as to whether he was in the courtroom. But when the record is silent, a reviewing court will not presume that the defendant and/or his counsel were absent. State v. Hawkins , 10th Dist. Franklin No. 10AP-907, 2011-Ohio-6658, 2011 WL 6826814, ¶ 49. Rather, the record must affirmatively indicate the absence of the defendant. State v. Clark , 38 Ohio St.3d 252, 258, 527 N.E.2d 844 (1988).[2]
{¶ 145} Beasley has not demonstrated a violation of his rights or prejudice arising therefrom.
2. Failure to File an Affidavit of Disqualification (Proposition of Law No. 7(B) )
{¶ 146} Judge Lynne S. Callahan had previously presided at the trial of Brogan Rafferty. She noted that fact when she *1058 granted Beasley's Crim.R. 29 motion as to Count 25, by way of distinguishing the evidence in the two cases:
I clearly remember the testimony regarding the firearm of David Pauley that was in the last trial. I don't believe there is testimony of that in this trial.
Based on these facts, Beasley claims that his trial counsel were ineffective for failing to file an affidavit of disqualification against Judge Callahan.
{¶ 147} A judge is not disqualified from presiding over a trial simply because she formed an opinion as to the facts during an earlier trial of a codefendant. In *522 re Disqualification of Adams , 100 Ohio St.3d 1223, 2002-Ohio-7474, 798 N.E.2d 9, ¶ 3. Moreover, the remark about the evidence from the Rafferty trial was not a sufficient basis for disqualification: when Beasley raised this issue in an attempt to disqualify Judge Callahan from presiding over his postconviction proceedings, his petition was denied. In re Disqualification of Callahan , 143 Ohio St.3d 1268, 2014-Ohio-3175, 39 N.E.3d 1255, ¶ 8.
{¶ 148} Defense counsel's failure to seek disqualification here cannot be categorized as ineffective assistance, because such an affidavit, if filed, would have been denied. See State v. Johnson , 8th Dist. Cuyahoga No. 99656, 2013-Ohio-5430, 2013 WL 6571859, ¶ 15 (failure to file a motion to suppress did not constitute ineffective assistance of counsel when the motion would have been denied); State v. McGlosson , 12th Dist. Butler No. CA2012-03-057, 2013-Ohio-774, 2013 WL 837165, ¶ 27 (same). Nor do we see how Judge Callahan's remark, made in the course of granting a Crim.R. 29 motion in Beasley's favor on one count, can show bias against him.
3. Deficient Performance at Voir Dire (Proposition of Law No. 7(C) )
{¶ 149} Beasley alleges that his trial counsel performed below an objective standard of reasonable representation during voir dire by failing to object to misstatements of law and by failing to question the prospective jurors sufficiently.
{¶ 150} R.C. 2929.03(B) requires a trial court to instruct the jury that capital specifications must be proved beyond a reasonable doubt, "but the instruction shall not mention the penalty that may be the consequence of a guilty or not guilty verdict on any charge or specification." Beasley's first contention that counsel were ineffective during voir dire, made without citation, is that "[t]his preclusion is equally applicable to information provided to prospective jurors in voir dire." And he argues that this rule was violated by counsel and the trial court when, without objection, they told the prospective jurors that they would consider mitigation only if they convicted on one or more capital specifications. This is a baseless argument. The statute plainly applies to the jury instructions before deliberations, not to statements made during voir dire. It would be impossible to conduct a meaningful voir dire of a capital jury if the parties were forbidden to explain how the process works, including the bifurcation of the proceedings.
{¶ 151} Beasley next contends that on two occasions during voir dire, while questioning individual potential jurors, the trial court omitted the phrase "beyond a reasonable doubt" when discussing the process of weighing aggravating circumstances against mitigating factors.[3]
*1059 Beasley challenges his trial counsel's failure to *523 object to these misstatements of law. However, "shorthand references to legal concepts during voir dire cannot be equated to final instructions given shortly before the jury's penalty deliberations." State v. Stallings , 89 Ohio St.3d 280, 285, 731 N.E.2d 159 (2000). The trial judge gave correct instructions of law before the mitigation hearing began and before deliberations, and those instructions cured any earlier misstatement during voir dire, State v. Thompson , 141 Ohio St.3d 254, 2014-Ohio-4751, 23 N.E.3d 1096, ¶ 237. Therefore, Beasley's second theory of ineffective assistance during voir dire has no merit.
{¶ 152} In his third theory, he faults counsel for not questioning jurors more thoroughly about their willingness to consider mitigation evidence. He claims that his counsel were ineffective because they did not ask specific questions as to whether the jurors were able to consider as mitigation child abuse, psychological testimony, intergenerational family conflict, and proportionality. We rejected a similar argument in State v. Mundt , 115 Ohio St.3d 22, 2007-Ohio-4836, 873 N.E.2d 828, on the grounds that "the parties are not entitled to ask about specific mitigating factors during voir dire," id. at ¶ 84. And we have clarified that the parties are not precluded from asking about specific mitigation factors during voir dire but that the court has discretion whether or not to allow such questioning. State v. Pickens , 141 Ohio St.3d 462, 2014-Ohio-5445, 25 N.E.3d 1023, ¶ 59-60. The analysis in Pickens implicitly reaffirmed Mundt : counsel are not ineffective for failing to attempt something that the court need not allow.
{¶ 153} Fourth, Beasley asserts that counsel's voir dire questioning was insufficiently probing as to the prospective jurors' exposure to pretrial publicity. We have consistently held that "counsel is in the best position to determine whether any potential juror should be questioned and to what extent." State v. Murphy , 91 Ohio St.3d 516, 539, 747 N.E.2d 765 (2001). Because voir dire decisions are subjective and prone to individual strategy, we refuse to second-guess counsel regarding how prospective jurors might have been questioned. Thompson at ¶ 225. Moreover, as discussed in the section on venue, there is no evidence of pretrial publicity in the record, so we cannot determine what additional questioning might have been warranted.
4. Deficient Performance in Cross-Examination (Proposition of Law No. 7(D)(2) )
{¶ 154} Defense counsel declined to cross-examine seven state witnesses: Summer Rowley, Dwight Johnson, Alex Hartke, Dan DeWalt, David LeBlond, George Brown, and Debra Bruce. Beasley calls this deficient performance, but he does not explain how cross-examination of these witnesses could have helped his defense.
{¶ 155} To prevail on such a claim, a defendant must identify the questions that he believes his counsel should have asked and must provide some sense of the *524 information that might have been elicited. State v. Frazier , 115 Ohio St.3d 139, 2007-Ohio-5048, 873 N.E.2d 1263, ¶ 220. Otherwise, we will presume that the choice to forgo cross-examination "constituted a legitimate tactical decision." Id. ; see also State v. Foust , 105 Ohio St.3d 137, 2004-Ohio-7006, 823 N.E.2d 836, ¶ 90 (holding that counsel made a legitimate tactical decision to forgo additional cross-examination when the defendant "fail[ed] to explain how further cross-examination of [the witness] would have made a difference in his case").
{¶ 156} Alternatively, Beasley claims that his counsel were ineffective in cross-examining *1060 11 witnesses because counsel's questions merely asked the witnesses to repeat their direct testimony without challenging them, thereby bolstering their credibility. Beasley does not describe the content of the cross-examination, but instead simply cites transcript page numbers.[4]
{¶ 157} Ineffective assistance has been found when counsel needlessly introduced damaging testimony during cross-examination. Fisher v. Gibson , 282 F.3d 1283, 1299 (10th Cir.2002) (defense counsel successfully excluded officer's direct testimony regarding a blood-covered fingerprint, then reintroduced the subject on cross-examination, allowing the officer to present the previously excluded testimony). But Beasley has not shown that this occurred, and therefore he has not established deficient performance by his trial counsel.
{¶ 158} To the contrary, it is often apparent what points his defense counsel were attempting to make through their questioning. For example, a key element of Beasley's defense was the absence of any physical evidence tying him to the murders. So when the state presented a witness from the FBI evidence-response team, defense counsel emphasized the thoroughness of the search to make the point that if there had been any physical evidence implicating Beasley, the FBI would have found it. Counsel engaged in this same tactic with a number of law-enforcement witnesses.
{¶ 159} Beasley faults his counsel for eliciting inadmissible information on cross-examination. Detective Jason Mackie testified during direct examination that when he arrested Beasley, he recorded some of the conversations with Beasley in the police car and at the police station. The tape was then played, and the jury heard Beasley end the interview by refusing to answer questions until his lawyer was present. Defense counsel did not object to the jury's hearing Beasley assert his constitutional rights.
{¶ 160} Instead, defense counsel drew attention to the tape in its cross-examination of Detective Mackie. After counsel walked Mackie through the conversation, the following exchange occurred:
*525 Q: And then he asked you what charge [he was facing], and you said * * * we are stopping here because you exercised your right to counsel and we cannot discuss this with you anymore, right?
A: Yes.
Given that the jury had already heard Beasley invoke his right to counsel in his own words during the direct examination of the witness, the repetition was plainly harmless.
5. Deficient Performance: Expert Witness (Proposition of Law No. 7(D)(1)(e) )
{¶ 161} Beasley claims that his trial counsel were ineffective for failing to move the court to exclude the testimony of William Bennett, the state's handwriting-analysis expert, for three reasons. First, he asserts that the court never granted the state's motion to qualify Bennett as an expert. This is incorrect, as the transcript shows:
*1061 Prosecutor: Your Honor, I'd ask that he be qualified as an expert in handwriting identification?
The Court: Any objection?
Defense counsel: We are not stipulating to that but I'm not objecting.
The Court: All right.
In context, the court's statement, "All right," granted the motion to qualify Bennett as an expert.
{¶ 162} Second, Bennett offered his testimony "within a reasonable degree of certainty based upon [his] experience and training." Beasley challenges this as an "amorphous" standard. Expert witnesses in the field of handwriting analysis generally offer their opinions to "a reasonable degree of scientific certainty." (Emphasis added.) E.g. State v. Loza , 71 Ohio St.3d 61, 77, 641 N.E.2d 1082 (1994) ; State v. Powell , 8th Dist. Cuyahoga No. 99386, 2014-Ohio-2048, 2014 WL 2019258, ¶ 96. However, under Evid.R. 702, experts are not required to use any particular "magic words." Lucsik v. Kosdrosky , 2017-Ohio-96, 79 N.E.3d 1284, ¶ 15 (8th Dist.). Rather, an expert's opinion is admissible so long as it provides evidence of more than mere possibility or speculation. Id. (expert testimony admissible even though not offered to "a reasonable degree of medical certainty"); Butler v. Minton , 6th Dist. Erie No. E-05-061, 2006-Ohio-4800, 2006 WL 2640269, ¶ 17 (same); see also *526 Johnson v. Memphis Light Gas & Water Div. , 695 Fed.Appx. 131, 136-137 (6th Cir.2017) (same result under Federal Rules of Evidence).
{¶ 163} Third, Beasley challenges the admissibility of Bennett's testimony on the grounds that "handwriting comparison does not have sufficient support in the relevant literature to be the subject of admissible expert testimony." In support of this proposition, he cites a 2009 paper from the National Research Council that is not in the record and that therefore cannot be considered on direct appeal. See State v. Spaulding , 151 Ohio St.3d 378, 2016-Ohio-8126, 89 N.E.3d 554 (holding that it is impermissible to rely on evidence outside the record on direct appeal). And Beasley has cited no cases in which courts have categorically rejected the science of handwriting comparison. To the contrary, courts in other states continue to allow such testimony routinely. See, e.g. , Hardin v. Montgomery , 495 S.W.3d 686, 706-707 (Ky.2016) (handwriting experts used in election contest alleging forged poll-book signatures); State v. Willis , 496 S.W.3d 653, 670-671 (Tenn.2016) (handwriting expert used in murder prosecution).
{¶ 164} Beasley's claims of ineffective assistance of counsel have no merit and are rejected.
E. Proposition of Law Nos. 6 and 7(D)(1)(b): Hearsay and Confrontation Clause
{¶ 165} In proposition of law No. 6, Beasley argues that the trial court allowed 13 witnesses to testify, often over objection, to hearsay statements. He contends that the admission of these out-of-court statements violated his rights under the Confrontation Clause of the Sixth Amendment to the United States Constitution. And he argues that his trial counsel were ineffective for failing to object to some of the allegedly inadmissible testimony.
1. Statements Regarding the Victims' Plans
{¶ 166} The defense raised a hearsay objection during the testimony of Summer Rowley, the state's first witness, when she began to relate what Ralph Geiger had told her regarding his plans for the future. The trial court overruled the objection without explanation. Rowley then testified that Geiger told her that "he was going down south to a farm that he was going to *1062 work on." The judge allowed defense counsel a continuing objection to Rowley's testimony about her conversations with Geiger. Rowley then testified that Geiger had told her that "somebody needed a farmhand," that he would not have cellphone coverage on the farm, and that his new boss was going to drive him down to the farm. Defense counsel renewed their objection to the hearsay, and the court "[n]ote[d] [a] continuing objection."
{¶ 167} The next witness, Dwight Johnson, testified, "Ralph had told me that he had had a job," and the defense again objected. Once again, the trial judge *527 dismissed the objection by simply saying, "[I] note your continu[ing] objection." Johnson then testified that Geiger said he got a job in Dover, Ohio, working on a farm.
{¶ 168} The pattern continued as relatives of the other victims testified. When Debra Bruce, David Pauley's sister, took the stand, the trial court overruled a defense hearsay objection, once more noting a continuing objection. Bruce proceeded to recount conversations in which her brother described his job search and the job he had found on a 688-acre farm. The court also overruled defense objections to Tina and Nicholas Kern testifying to Tim's statements about the farm job, in each case noting a continuing objection.
{¶ 169} On appeal, Beasley contends that all of this evidence was improper hearsay. Hearsay is "a statement, other than one made by the declarant while testifying * * * offered in evidence to prove the truth of the matter asserted." Evid.R. 801(C). But if a statement is offered for another purpose, then it is not hearsay and is admissible. State v. Osie , 140 Ohio St.3d 131, 2014-Ohio-2966, 16 N.E.3d 588, ¶ 118.
{¶ 170} In this case, the evidence was not offered to prove the truth of the matters asserted: Geiger, Pauley, and Kern did not have jobs taking care of a cattle farm. Rather, it was offered to prove that false statements were made to them . In re Application of McKinney , 134 Ohio St.3d 260, 2012-Ohio-5635, 981 N.E.2d 847, ¶ 18 (statements were admissible because they were offered to show what a bar applicant was told about her termination, not to prove the actual reasons for her termination); see also State v. Maurer , 15 Ohio St.3d 239, 262, 473 N.E.2d 768 (1984) ("it is non-hearsay if an out-of-court statement is offered to prove a statement was made and not for its truth"). The trial court therefore properly overruled Beasley's hearsay objections.
{¶ 171} Because the statements were not hearsay, they do not implicate the Confrontation Clause. State v. McKelton , 148 Ohio St.3d 261, 2016-Ohio-5735, 70 N.E.3d 508, ¶ 186 ; Crawford v. Washington , 541 U.S. 36, 59, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004), fn. 9.
2. Statements that Established Law Enforcement's Investigatory Steps
{¶ 172} Beasley also cites testimony from a number of law-enforcement officials, but their statements do not qualify as hearsay either. Law-enforcement officers may testify to out-of-court statements for the nonhearsay purpose of explaining the next investigatory step. McKelton at ¶ 186. Testimony to explain police conduct is admissible as nonhearsay if it satisfies three criteria: (1) the conduct to be explained is relevant, equivocal, and contemporaneous with the statements, (2) the probative value of the statements is not substantially outweighed by the danger of unfair prejudice, and (3) the statements do not connect *528 the accused with the crime charged. State v. Ricks , 136 Ohio St.3d 356, 2013-Ohio-3712, 995 N.E.2d 1181, ¶ 27.
{¶ 173} The testimony of FBI agent Corey Collins satisfies all three requirements.
*1063 Collins testified that he heard from other investigators that Joe Bais had denied posting the Craigslist ads and that Bais told investigators that he had someone else living with him at the time the ads were posted. And Collins explained that based on that information, he pursued other avenues to identify the computer user: specifically, he connected the IP address for the ad to the e-mail communication that led to Penny Kaufman's renting a room to Beasley. In other words, his testimony about the second-hand information from Bais served to explain why the investigation moved in a certain direction, not to affirmatively prove Bais's innocence. And Beasley does not even attempt to show that the specific statements were in any way prejudicial.
{¶ 174} The same analysis applies to most of the testimony from FBI agents Jack Vickery, Mike Daugherty, and Todd Wickerham. For example, to explain how the police learned of the 8961 number, which allowed them to triangulate Beasley's location, Daugherty and Wickerham testified about Joe Bais receiving a note to "call Dutch." Likewise, Vickery testified that information from Nicholas Kern about Tim Kern's job search led him to the location where Kern's Buick was discovered.[5]
{¶ 175} Here again, because the statements were nonhearsay, they do not implicate the Confrontation Clause. McKelton , 148 Ohio St.3d 261, 2016-Ohio-5735, 70 N.E.3d 508, at ¶ 186.
{¶ 176} Portions of Vickery's testimony, specifically, when he recounted information relayed to him by Scott Davis, did not appear to clearly connect to any subsequent investigatory steps. However, because Davis had already testified to the same information, the error was harmless. See State v. Spirko , 59 Ohio St.3d 1, 33, 570 N.E.2d 229 (1991).
{¶ 177} The same is true with respect to the testimony of parole officer Jeffrey Jones. Jones testified that in August and September 2011, he visited the home of Beasley's mother five or six times in search of Beasley. During a visit on September 22, she told Jones that her son had come to her home a couple of weeks prior, staying only long enough to take some winter clothing, and that he had shaved his beard and dyed his hair and mustache. Jones was not investigating the Craigslist crimes, so he had no "next investigatory step" to link this information to. However, Kaufman later testified without objection from defense *529 counsel about Beasley having dyed his hair. And the testimony about his shaving his mustache in September was beneficial to Beasley, inasmuch as it cast doubt on Davis's testimony that his assailant was newly shaven. Thus, the admission of Jones's testimony was harmless.
{¶ 178} Because Confrontation Clause claims are also subject to harmless-error analysis, McKelton , 148 Ohio St.3d 261, 2016-Ohio-5735, 70 N.E.3d 508, at ¶ 192, Beasley's Sixth Amendment claim regarding these statements must fail as well.
3. Excited Utterances
{¶ 179} Both Jeff Schockling and Sheriff Hannum testified to statements made by Scott Davis regarding the circumstances that led to his getting shot. Davis's hearsay statements were admissible as excited utterances under Evid.R. 803(2). Under that rule, a statement "relating to a startling event or condition" and "made while the declarant [is] under the stress of excitement caused by the event *1064 or condition" is not excluded by the hearsay rule. The statement must concern an event startling enough to produce nervous excitement in the declarant after the declarant observed the event, State v. Huertas , 51 Ohio St.3d 22, 31, 553 N.E.2d 1058 (1990), must be made while the declarant is under the stress of the event, and cannot be the product of reflective thought, State v. Taylor , 66 Ohio St.3d 295, 303, 612 N.E.2d 316 (1993).
{¶ 180} The evidence demonstrates that Davis was under the stress of having been shot when he made his statements to Schockling. He was still bleeding from the gunshot to his elbow when he appeared at Schockling's door. Schockling described him as pale and shaking, scared, and fidgety. See State v. Manzell , 5th Dist. Stark No. 2006CA00258, 2007-Ohio-4076, 2007 WL 2283550, ¶ 14 (statement admissible when victim was still "wounded and scared" from the incident). Sheriff Hannum arrived at Schockling's house about 15 minutes after the 9-1-1 call and spoke to Davis while he was in the emergency squad's vehicle receiving treatment. See State v. Woods , 5th Dist. Stark No. 2013CA00176, 2014-Ohio-2375, 2014 WL 2559211, ¶ 31-32 (statement to police 20 minutes after shooting, while victim was in hospital receiving treatment, qualified as an excited utterance).
{¶ 181} Although admissible under the hearsay rules, these statements must also be evaluated under the Confrontation Clause. The Confrontation Clause applies only to "testimonial statements." State v. Muttart , 116 Ohio St.3d 5, 2007-Ohio-5267, 875 N.E.2d 944, ¶ 59. A statement is testimonial if it is made with " 'a primary purpose of creating an out-of-court substitute for trial testimony.' " State v. Montgomery , 148 Ohio St.3d 347, 2016-Ohio-5487, 71 N.E.3d 180, ¶ 87, quoting Michigan v. Bryant , 562 U.S. 344, 358, 131 S.Ct. 1143, 179 L.Ed.2d 93 (2011).
*530 {¶ 182} With respect to Davis's statements to Schockling, whether a statement to a person who is not a law-enforcement officer is testimonial depends on the expectations of the declarant: would the declarant have reasonably believed that the statement would be available for later use at trial? State v. Jones , 135 Ohio St.3d 10, 2012-Ohio-5677, 984 N.E.2d 948, ¶ 161. A truly excited utterance is unlikely ever to meet this standard; certainly an objective observer would not believe that when Davis, scared, bleeding, and in shock, sought help from strangers, he expected his statements to be available for use at trial. See id. at ¶ 162-163.
{¶ 183} Davis's statements to Sheriff Hannum are also nontestimonial. Statements to police officers responding to an emergency situation are generally considered nontestimonial precisely because the declarant is usually acting-under great emotional duress-to secure protection or medical care. See State v. Knecht , 12th Dist. Warren No. CA2015-04-037, 2015-Ohio-4316, 2015 WL 6125747, ¶ 24-25 (victim's statement to responding police officers that her husband beat her was nontestimonial); State v. McKenzie , 8th Dist. Cuyahoga No. 87610, 2006-Ohio-5725, 2006 WL 3095671, ¶ 17 (victim's statement was nontestimonial because her primary purpose was to alert police to an ongoing emergency).
4. Testimony Regarding Business Records
{¶ 184} Beasley also objects to the testimony of Guy Smith, whose father owned Smitty's Gun Shop. Smith worked in the store prior to its closing in 2012. Smith testified that when a gun was brought to the shop, the procedure was to log it into the official United States Bureau of Alcohol, Tobacco, Firearms, and Explosives (''ATF'') logbook and then tag it. He *1065 identified the store's ATF logbook and gun tag, the contents of which established that "Ralph Geiger" brought in an Iver Johnson pistol for repairs on November 8, 2011. Smith testified that he did not personally log in the gun or see the owner. Beasley objects to this testimony as hearsay, because Smith was relating information that he heard from his father.
{¶ 185} Evid.R. 803(6) creates a hearsay exception for certain business records. To qualify for admission under Evid.R. 803(6), the record must meet four requirements:
"(i) the record must be one regularly recorded in a regularly conducted activity; (ii) it must have been entered by a person with knowledge of the act, event or condition; (iii) it must have been recorded at or near the time of the transaction; and (iv) a foundation must be laid by the 'custodian' of the record or by some 'other qualified witness.' "
*531 State v. Davis , 116 Ohio St.3d 404, 2008-Ohio-2, 880 N.E.2d 31, ¶ 170, quoting Weissenberger, Ohio Evidence , Section 803.73, at 600 (2007), quoting Evid.R. 803(6). A "qualified witness" is someone with " 'enough familiarity with the record-keeping system of the business in question to explain how the record came into existence in the ordinary course of business.' " State v. Hood , 135 Ohio St.3d 137, 2012-Ohio-6208, 984 N.E.2d 1057, ¶ 40, quoting 5 McLaughlin, Weinstein's Federal Evidence , Section 803.08[8][a] (2d Ed.2009).
{¶ 186} Smith's testimony established all four elements, including his knowledge of the recordation process. See, e.g. , State v. Coleman , 5th Dist. Richland No. 14-CA-82, 2015-Ohio-3907, 2015 WL 5608526, ¶ 38-42 (pharmacy employees were qualified witnesses to testify to logbook entries detailing sales of pseudoephedrine).
{¶ 187} Finally, the gun log was not testimonial-and therefore did not implicate the Confrontation Clause-because Smitty's created it as part of its regularly conducted business activity and not for use at trial. See State v. Maxwell , 139 Ohio St.3d 12, 2014-Ohio-1019, 9 N.E.3d 930, ¶ 56-57.
{¶ 188} Based on this analysis, we conclude that most of the testimony was properly admitted and the testimony that was not properly admitted was harmless. For this reason, Beasley's claim that his counsel were ineffective for failing to object on hearsay grounds has no merit. We reject proposition of law Nos. 6 and 7(D)(1)(b).
F. Proposition of Law Nos. 5, 7(D)(1)(c), and 7(D)(1)(d): Prior-Bad-Acts Evidence and the Failure to Grant a Mistrial
{¶ 189} In a number of overlapping propositions of law, Beasley alleges that evidence of his prior criminal convictions was improperly admitted. Based on this evidence and the presence of allegedly biased juror No. 5, he asserts that the trial court should have granted a mistrial. Alternatively, he claims that his trial counsel were ineffective for failing to object to the prior-bad-acts evidence and/or failing to seek a mistrial.
{¶ 190} Before trial, Beasley filed a motion in limine to prohibit the state from introducing "any testimony and/or evidence that [he] has been charged or convicted of criminal offenses which are not related to the case before this Court." The trial court granted the motion. But during the state's case-in-chief, at least four witnesses referred to Beasley's prior criminal history.
{¶ 191} Parole Officer Jeffrey Jones testified that as of August 2, 2011, Beasley was in violation of his parole. This testimony was necessary to prove the R.C. 2929.04(A)(4) capital specifications for *1066 breaking detention, and Beasley did not object to this evidence. (Beasley did object to a different statement from Jones, relating to other warrants, but the court sustained the objection.) *532 {¶ 192} Sheriff Hannum testified that United States Marshals had come to his office asking about "Mr. Hood." They asked for the sheriff's cooperation in placing the Hood property under surveillance. Hannum later learned that the marshals were "keeping an eye out for a fella named Beasley." Former Noble County detective Jason Mackie testified that before Davis was shot, "the U.S. Marshals fugitive task force came to Noble County on a mission to find a man named Richard Beasley." Mackie assisted the marshals, who, he repeated, were "hunting" for Beasley.
{¶ 193} Finally, Agent Wickerham discussed how the police came to consider Beasley a suspect in the Davis shooting. He said that Beasley's name came from the United States Marshals, who were searching for him in the area because "Beasley was a wanted fugitive, had a close associate in prison and was located in the area where Scott Davis was shot." Later, the state asked about the speed with which investigators were receiving information. Wickerham gave a long answer describing all the various law-enforcement agencies that were involved in the investigation, at the end of which he stated:
So we also brought Akron [Police Department] into this and Akron investigators and detectives who had previously dealt with Mr. Beasley and [we] brought them in as part of this investigative team. And they had a lot of background and history on Mr. Beasley and his previous criminal activity .
(Emphasis added.)
{¶ 194} In proposition of law No. 5, Beasley alleges that the italicized statement by Wickerham was a deliberate violation of the order in limine and that the trial court should have granted the defense's motion for a mistrial. In this context, Beasley renews his objection to juror No. 5, the allegedly biased juror, and asserts this as another reason why a mistrial should have been granted. In proposition of law No. 7(D)(1)(c), Beasley asserts that the testimony of Hannum and Mackie was so unfairly prejudicial that his counsel should have objected. And in proposition of law No. 7(D)(1)(d), he asserts that his counsel should have objected to, and sought a mistrial based on, the cumulative testimony of Hannum, Mackie, and Wickerham.
{¶ 195} At the outset, we note that proposition of law No. 5 is based on a false premise. Defense counsel never moved for a mistrial. After defense counsel objected, the judge called a sidebar conference and asked the parties how they wished to proceed. The state and the defense agreed not to address the matter in front of the jury because that would only call more attention to Wickerham's inappropriate statement. Instead, the court called a recess, during which the state *533 cautioned its witness not to violate the order in limine. Defense counsel did not ask the court to put a ruling on the record or issue a limiting instruction.
{¶ 196} On their merits, these claims are all untenable, because the fact that Beasley was a fugitive from justice was an essential element of his defense. When Parole Officer Jones was on the stand, defense counsel introduced a parole-violation report on Beasley dated January 21, 2011, to bolster their theory that Beasley assumed Geiger's identity in January *1067 because he knew that he was wanted by the authorities. The information was therefore not prejudicial.
{¶ 197} Beasley's contention that the state improperly solicited from County Hood the fact that Beasley and County's father were in prison together is similarly unfounded. County testified during the state's rebuttal case, after Beasley had taken the stand, had described his own criminal history, and had laid out his claim that he went on the run in January, using Ralph Geiger's identity, to avoid rearrest.
{¶ 198} For these reasons, these propositions are without merit.
G. Proposition of Law No. 8: Allocution
{¶ 199} In his eighth proposition of law, Beasley contends that the trial court deprived him of a meaningful opportunity to allocute. The record does not support this claim.
{¶ 200} At the time of sentencing, the trial court must directly address the defendant and ask whether he or she wishes to make a statement or present information in mitigation of punishment. Crim.R. 32(A)(1). If the court imposes sentence without affording the defendant an opportunity to allocute, then resentencing is required unless the error was invited or harmless. Osie , 140 Ohio St.3d 131, 2014-Ohio-2966, 16 N.E.3d 588, at ¶ 179. A defendant may waive the right to speak in allocution. State v. Campbell , 90 Ohio St.3d 320, 325, 738 N.E.2d 1178 (2000).
{¶ 201} Before imposing sentence, the trial judge directly addressed Beasley: "Mr. Beasley, you are afforded the right of allocution, or to make a statement, if you wish to do so. Do you wish to make a statement, sir?" Beasley said that he wanted to speak after the victim-impact statements, and the judge said, "Do you wish to address the Court with regard to your sentence?" And twice on the record, Beasley said no, he did not wish to address the court. The trial court then imposed sentence as to the capital charges.
{¶ 202} Before imposing sentence on the noncapital charges, the court heard statements from Scott Davis and a friend and a family member of the victims. At that point, Beasley asked the court for permission to make a statement. After expressing sympathy for the families, Beasley insisted on his innocence, promised that his conviction would be reversed on appeal, and attacked the credibility of *534 one of the state's witnesses. The trial court interrupted: "Mr. Beasley, if you want to address me about sentencing on the remaining charges, you may. I am not going to sit here and retry this case with you." Beasley repeated his claims of innocence, invited the families to write to him with questions, and then concluded, "That is it."
{¶ 203} Based on this record, we find that Beasley waived his right to allocute. In his reply brief, he faults the trial court for not making sure he understood precisely when and how he could exercise his right of allocution. But the trial court's statement to Beasley was clear, and Crim.R. 32(A)(1) does not impose any greater burden on the court.
{¶ 204} Moreover, we note that the purpose of allocution is "to permit the defendant to speak on his own behalf or present any information in mitigation of punishment." State v. Reynolds , 80 Ohio St.3d 670, 684, 687 N.E.2d 1358 (1998). A trial court does not err by limiting a defendant's presentence statement to those issues that bear upon the sentence and may have mitigative weight. State v. Cedeno , 8th Dist. Cuyahoga Nos. 102327 and 102328, 2015-Ohio-5412, 2015 WL 9460555, ¶ 38 ; State v. Smith , 2d Dist. Greene No. 94-CA-86, 1995 WL 655943, *2-3 (Nov. 8, 1995). But renewed challenges to the adjudication of guilt are not a proper part of *1068 allocution. Cleveland v. Reese , 8th Dist. Cuyahoga No. 102936, 2016-Ohio-296, 2016 WL 515907, ¶ 27-28 ; see also Smith at *2-3.
{¶ 205} Beasley compares his case to the facts in Campbell , 90 Ohio St.3d 320, 738 N.E.2d 1178, and Green , 90 Ohio St.3d 352, 738 N.E.2d 1208. But in those cases, the trial court erred by failing to address the defendant directly and individually, as required by Crim.R. 32(A)(1). Campbell at 324-325, 738 N.E.2d 1178 ; Green at 359, 738 N.E.2d 1208. Those cases are plainly distinguishable. Thus, we reject proposition of law No. 8.
H. Proposition of Law No. 10: "Substantial Credible Evidence"
{¶ 206} In his tenth proposition of law, Beasley argues that the state failed to present substantial credible evidence linking him to the murders of Ralph Geiger, David Pauley, or Tim Kern or to the attempted murder of Scott Davis. In this proposition, Beasley appears to be challenging the sufficiency of the evidence and asserting that his convictions are against the manifest weight of the evidence. We reject both contentions.
{¶ 207} In a test for sufficiency, " 'the relevant question is whether, after reviewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.' " (Emphasis sic.) Stallings , 89 Ohio St.3d at 289, 731 N.E.2d 159, quoting Jackson v. Virginia , 443 U.S. 307, 319, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979). A sufficiency challenge asks whether the evidence adduced at trial "is *535 legally sufficient to support the jury verdict as a matter of law." Lang , 129 Ohio St.3d 512, 2011-Ohio-4215, 954 N.E.2d 596, at ¶ 219. Evaluation of the witnesses' credibility is not relevant to a sufficiency analysis. State v. Yarbrough , 95 Ohio St.3d 227, 2002-Ohio-2126, 767 N.E.2d 216, at ¶ 79.
{¶ 208} By contrast, to evaluate a manifest-weight claim, a court must review the entire record, weigh the evidence and all reasonable inferences, and consider the credibility of witnesses. McKelton , 148 Ohio St.3d 261, 2016-Ohio-5735, 70 N.E.3d 508, at ¶ 328. The court must decide whether " 'the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed.' " Id. , quoting State v. Martin , 20 Ohio App.3d 172, 175, 485 N.E.2d 717 (1st Dist.1983).
1. Ralph Geiger
{¶ 209} The evidence proves, beyond a reasonable doubt, that Beasley murdered Ralph Geiger. Geiger disappeared, and was most likely murdered, the morning of August 9, 2011. And after his death, Beasley used Geiger's identity to apply for jobs, open a bank account, rent rooms, and seek medical care.
{¶ 210} The letter and map that Joyce Grebelsky received from "Chris Star" from the Summit County Jail strongly implicate Beasley in Geiger's murder. Grebelsky, Bennett (the handwriting expert), and the misspelling of Grebelsky's name all identify Beasley as the author. The map pinpointed the location where Geiger's driver's license, birth certificate, and Social Security card were hidden. And the evidence that Beasley murdered Pauley and led Davis into the woods for the same purpose implicates him in Geiger's death: it shows his pattern of killing and concealing his victims in the same remote location. The evidence at trial was legally sufficient to support the jury's verdict as to the crimes against Geiger.
{¶ 211} Beasley's weight-of-the-evidence challenge regarding Geiger's *1069 murder centers on the question of motive. He argues that the state's theory of the crime-that Beasley and Rafferty lured Geiger to the Caldwell farm in August 2011 to rob and kill him-makes no sense because Geiger, as a homeless man, had no property worth stealing.[6] But the state's evidence shows that Geiger did have one thing of value to Beasley: his identity.
{¶ 212} The critical question, then, is when Beasley began using Geiger's name. Beasley claims that he obtained Geiger's documents and permission to use his identity in January 2011, months before Geiger was killed. But he presented no witnesses who claimed to know him as Geiger before August. (Grebelsky did not *536 testify as to when Beasley asked her to start calling him Ralph.) Instead, he relies solely on Akron Community Health patient records showing that Ralph Geiger first sought treatment on January 28, 2011. Beasley suggests that it was he, and not the real Ralph Geiger, who sought treatment that day. His proof, apart from his own testimony, is the patient photograph in the file. If the first step when admitting a new patient is to take his picture and if the picture in the patient file is of Beasley, then (he contends) that proves that he was already masquerading as Geiger in January.
{¶ 213} But the jury could find that the state sufficiently refuted this argument. In the photograph from the clinic, which Beasley claims was taken on January 28, he is clean-shaven except for a closely trimmed black goatee, and his hair is not visible under his ball cap. But on February 9, a mere 12 days later, when Beasley was photographed at the Summit County Jail, he had a full gray beard that dropped below his chin and long hair past his neckline. Based on this evidence, the jury could reasonably conclude that the photograph in the patient records was taken in September, after Geiger's murder. And if the photograph was taken in September, then Beasley's manifest-weight-of-the-evidence argument collapses.
{¶ 214} We hold that Beasley's conviction for murdering Ralph Geiger was supported by sufficient evidence and was not against the manifest weight of the evidence.
2. David Pauley
{¶ 215} The state presented sufficient proof to establish Beasley's culpability for the murder of David Pauley. Don Walters testified that on the day of Pauley's disappearance, Beasley and Rafferty came to his home driving Pauley's truck, pulling a U-Haul that contained Pauley's belongings. Police found Pauley's possessions in Beasley's room after Beasley was arrested, and Joe Bais testified that Beasley offered some of Pauley's ammunition cases to him. And Carla Conley, the U-Haul employee, identified Beasley as one of the men who returned the trailer Pauley had rented. Once again, though, the most powerful evidence of Beasley's guilt is the letter and map that he sent to Grebelsky from jail. That map revealed the location of Pauley's laptop and the Dell computer used to place the ad that Pauley answered, both of which Beasley had hidden outside the Gridley Avenue house.
{¶ 216} Finally, the cellphone records connect Beasley to Pauley's murder. The 1804 phone was used to communicate with Pauley. Records show that the same phone also was used to arrange the meeting with Scott Davis, a meeting Beasley admits he attended, and was never used again after the plan to kill Davis went awry. The jury could therefore reasonably conclude that *1070 Beasley had used the 1804 phone, linking him directly to Pauley's death. In addition, on the morning *537 Pauley was killed, the 8961 phone was used in the vicinity where Pauley's body was found. And evidence linked that phone to Beasley: the voicemail messages for Walters, identified as Beasley's voice, came from that number, and the gun tag at Smitty's, in Beasley's handwriting, listed the 8961 number as his contact number.
{¶ 217} We hold that sufficient evidence supported the jury's verdict that Beasley murdered Pauley.
{¶ 218} We also hold that the jury's finding was not against the manifest weight of the evidence, because Beasley has not shown that the jury clearly lost its way in assessing the evidence. Beasley attacks Walters's credibility and even tried in his own testimony to implicate Walters in Pauley's murder. But Beasley's testimony and argument in this regard are not compelling and do not overcome the significant evidence of his guilt. During the 1804 phone's brief time in service, Rafferty and Walters both received calls from, or placed calls to, the 1804 number, which undercuts the theory that either man had been using the 1804 phone, and any suggestion that the phone was shared among multiple parties requires speculation.
{¶ 219} We hold that Beasley's conviction for murdering Pauley was supported by sufficient evidence and was not against the manifest weight of the evidence.
3. Scott Davis
{¶ 220} There was sufficient evidence proving that Beasley attempted to kill Davis. Davis himself testified to the circumstances that led him to meet Beasley in Caldwell. He described how Beasley led him into the woods and then shot him. In addition, before leaving to meet Davis, Beasley told his housemates, Kaufman and Romine, that he was traveling to claim a storage unit he had purchased and described the contents, which were similar to the property Davis said he was bringing with him. After the shooting, Beasley failed to call the police, which manifests a consciousness of guilt.
{¶ 221} Beasley's manifest-weight challenge also lacks merit. At trial, Beasley admitted that he was in Caldwell with Davis but claimed that Davis attacked him. However, he appears to have adopted a different theory on appeal. In his appellate brief, he attacks Davis's credibility by pointing out that Davis failed to identify him from a photo lineup and claimed to recall seeing a tattoo on Beasley's arm that was not visible. But those facts would be relevant only to undercut Davis's identification of Beasley as his companion in Caldwell, a fact that was not in dispute.
{¶ 222} The jury could reasonably have rejected Beasley's self-defense claim. From the moment he reached the Schockling home to the moment he testified, Davis remained consistent in the details of his story, whereas Beasley gave inconsistent accounts to his friends at the time, none of which matched the *538 version that he gave at trial. Moreover, Davis's story matches the circumstances of the Pauley and Kern murders.
{¶ 223} Finally, Beasley's defense is not credible on its face. He alleges that Davis was an assassin brought in by the younger Hood and the Brothers Motorcycle Gang to kill him because he was an informant, that the open grave was intended for him, not Davis, and that Rafferty was part of the plot. This theory required the jury to believe that everyone around Beasley was connected to these murders, but not Beasley himself. A more reasonable conclusion is that Beasley was himself the linchpin of the murders.
{¶ 224} We conclude that Beasley's attempted-murder conviction is supported by *1071 sufficient evidence and not against the manifest weight of the evidence.
4. Tim Kern
{¶ 225} Finally, the evidence supports Beasley's conviction for killing Tim Kern. Beasley met with Kern the morning he was killed, as shown by the Waffle House surveillance video. Walters testified that Beasley asked for help disposing of Kern's car. The voicemail messages support Walters's testimony: in the days immediately after the murder, Beasley was frantic to get help moving a car before it was discovered and impounded. The meeting with Kern was arranged on the 5353 phone, which made a call at precisely the same time as the surveillance video showed Beasley making a call. And after that day, the 5353 phone was never used again. Therefore, sufficient evidence supported the jury's finding.
{¶ 226} Beasley has not shown that the jury clearly lost its way when considering this evidence along with the other evidence introduced at trial. As discussed, Walters's credibility is bolstered by Beasley's frantic voicemail messages. Although Beasley argues that a pistol and bullets consistent with the weapon used to kill Kern were found in Rafferty's room, there is ample circumstantial evidence of Beasley's guilt. And the jury reasonably could have concluded that Beasley's testimony-that Rafferty left the 5353 phone in Beasley's truck and that Beasley answered it by chance and agreed to meet with Kern-makes no sense. By this time, according to Beasley, the younger Hood and Rafferty had already tried to have Davis, while pretending to be a job applicant, kill him, and yet he claims that he agreed to meet with another farm-job applicant who called him out of the blue. We conclude that Beasley's conviction for murdering Kern was not contrary to the manifest weight of the evidence.
5. Conclusion
{¶ 227} The evidence is sufficient to prove beyond a reasonable doubt that Beasley killed Geiger, Pauley, and Kern and tried to kill Davis. This is true even *539 without considering the modus operandi evidence that links the crimes and makes it likely that the perpetrator of one was the perpetrator of all.
I. Proposition of Law No. 9: Death Penalty is Unconstitutional
{¶ 228} In his ninth proposition of law, Beasley argues that Ohio's death-penalty process, as implemented, is unconstitutional and violates international law for numerous reasons. We have rejected each of these claims in prior decisions and so summarily reject this proposition of law. See State v. Kirkland , 140 Ohio St.3d 73, 2014-Ohio-1966, 15 N.E.3d 818, ¶ 106, 109-111, 116-117, 119-120.
J. Proposition of Law No. 11: Cumulative Error
{¶ 229} In proposition of law No. 11, Beasley urges us to reverse his convictions and death sentences on the grounds of cumulative error. The cumulative-error doctrine provides that "a conviction will be reversed when the cumulative effect of errors in a trial deprives a defendant of a fair trial even though each of the numerous instances of trial-court error does not individually constitute cause for reversal." State v. Powell , 132 Ohio St.3d 233, 2012-Ohio-2577, 971 N.E.2d 865, ¶ 223.
{¶ 230} Beasley has identified only three errors that can be described as harmless: the admission of two hearsay statements that were confirmed by other witnesses and the admission of Mackie's statement that when questioned, Beasley asserted his right to counsel. These do not constitute "multiple instances of harmless error" State v. Garner , 74 Ohio St.3d 49, 64, 656 N.E.2d 623 (1995). In addition, given the *1072 substance of the testimony in question, it cannot be said that the alleged errors collectively deprived him of a fair trial.
{¶ 231} Accordingly, we reject proposition of law No. 11.
K. Independent Sentence Evaluation
{¶ 232} We must independently review Beasley's death sentences for appropriateness and proportionality. R.C. 2929.05(A). In conducting this review, we must determine whether the evidence supports the jury's finding of an aggravating circumstance, whether the aggravating circumstance outweighs the mitigating factors, and whether Beasley's death sentences are proportionate to those affirmed in similar cases. Id.
1. Aggravating Circumstances
{¶ 233} The jury convicted Beasley of three counts of aggravated murder, each with four capital specifications. After merger, the jury considered for sentencing purposes one capital count for each victim with one specification attached to each: the aggravated murders and attempted murder were part of a single course of *540 conduct that involved the purposeful killing or attempt to kill two or more persons.
{¶ 234} The evidence supports the jury's finding of the course-of-conduct specifications beyond a reasonable doubt. Geiger, Pauley, Davis, and Kern were all lured to a remote location with the promise of a job and then shot so that Beasley and Rafferty could rob them. The only surviving victim, Davis, identified his assailant as Beasley. Computer and cellphone records linked Beasley to the fraudulent job postings. Beasley told witnesses that he would be acquiring the victims' property in the days before the murders, and witnesses later saw him with the property, or in the case of Geiger, using his identity, in the days after the crimes.
2. Mitigating Factors
{¶ 235} Next, we must weigh the above aggravating circumstance against any mitigating evidence about "the nature and circumstances of the offense" and Beasley's "history, character, and background." R.C. 2929.04(B). In addition, we must consider, if applicable, the statutory mitigating factors under R.C. 2929.04(B) : (1) victim inducement, (2) duress, coercion, or strong provocation, (3) mental disease or defect, (4) youth, (5) lack of significant criminal history, (6) accomplice only, and (7) any other relevant factors.
{¶ 236} The defense presented three mitigation witnesses.
a. William Jeffries
{¶ 237} Jeffries testified that he had known Beasley for about ten years and that he met him through church. He visits Beasley about once a week in prison and sometimes brings his Bible. He intends to continue making these visits as much as he can.
b. Carol Beasley
{¶ 238} Beasley's mother, Carol, testified that she became pregnant with Beasley when she was 16 years old. Beasley's father was married to someone else at the time, so she moved to Washington, D.C., where Beasley was born out of wedlock. She married Beasley's father when she was 17. But he was never around and provided no financial support, so she divorced him when Beasley was one and a half years old.
{¶ 239} When Beasley was close to two years old, Carol met Jim Beasley. After a few years of dating, they married. But Carol described Jim Beasley as a mean drunk, a gambler, and a jealous man. He physically abused Carol and Beasley. Everyone in the household, including Carol's two daughters, was afraid of Jim, and they learned to lie to avoid provoking him.
*1073 *541 {¶ 240} Carol also testified that she was sexually abused as a child and that she had recently learned that Beasley, when young, was sexually abused by some neighborhood boys.
{¶ 241} Beasley was a hyperactive child. He was prescribed Ritalin while in the fourth grade.
{¶ 242} She testified that Beasley spent summers in West Virginia with her parents when he was between five and seven years old. She indicated that he had a good relationship with his grandparents.
c. John Fabian, Ph.D.
{¶ 243} Forensic and clinical psychologist and neuropsychologist John Fabian diagnosed Beasley with attention-deficit hyperactivity disorder, a history of depression, self-reported alcohol addiction, and opioid abuse. He also diagnosed Beasley as suffering from two types of personality disorder: narcissistic-personality traits and antisocial-personality traits. And finally, he diagnosed cerebral dysfunction affecting his memory and other cognitive functions.
{¶ 244} Dr. Fabian described Beasley as highly intelligent; his I.Q. tested at 115. He also described "severe family dysfunction" to which Beasley was exposed as a child, beginning with the dysfunction Carol brought to the home as a result of her own history of trauma and abuse, which impaired her ability to parent. In fact, he reported that Carol once attempted suicide during her pregnancy with one of Beasley's sisters. Beasley experienced physical and emotional abuse from his stepfather and sexual abuse from neighborhood kids. Those experiences resulted in developmental failure.
{¶ 245} Beasley also had a history of transient ischemic attacks, or mini-strokes. Fabian testified that the cognitive dysfunction he observed resulted from these strokes.
3. Weight of Mitigating Factors
{¶ 246} As an initial matter, we find nothing mitigating in the nature and circumstances of Beasley's offenses. See R.C. 2929.04(B). Over a period of three months, he methodically lured multiple victims through ads promising jobs, interviewing multiple candidates to eliminate those most likely to fight back or be missed. He killed Ralph Geiger to steal his identity, killed David Pauley and Tim Kern to steal their meager possessions, and tried to kill Scott Davis. And when he was arrested in November 2011, he had already posted a new ad to lure more victims.
{¶ 247} Beasley presented evidence of a difficult childhood marked by his stepfather's emotional and physical abuse of him and his mother. Other than his grandparents in West Virginia, Beasley had no adult in his life to whom he could *542 form a healthy attachment. There was also testimony that other children sexually abused Beasley on one or more occasions, though the nature of the abuse was unclear. And Beasley suffered from brain damage, although Dr. Fabian did not cite that as a causative factor in any personality disorders that led to the murders.
a. Weighing
{¶ 248} Beasley has presented mitigating evidence that is cumulatively entitled to some weight. The benchmark case for assessing the weight of childhood trauma is State v. Tenace , 109 Ohio St.3d 255, 2006-Ohio-2417, 847 N.E.2d 386. The evidence in that case showed that Tenace was sold by his mother for sexual services, id. at ¶ 102, that his parents were criminals and drug addicts, id. at ¶ 103, and that he was encouraged to commit crimes, id. at ¶ 102-103. Based on these and other appalling facts, this court held that the mitigation evidence outweighed the aggravating circumstances of the offense. Id. at ¶ 97-106.
*1074 {¶ 249} The circumstances of Beasley's childhood, while also tragic, are not of the same magnitude. See Mundt , 115 Ohio St.3d 22, 2007-Ohio-4836, 873 N.E.2d 828, at ¶ 206 (mitigation evidence did not outweigh the aggravating circumstances because the defendant's unstable childhood "presents nothing comparable to Tenace "). Without question, the aggravating circumstance in this case, Beasley's murder of three individuals as part of a single course of conduct, outweighs the mitigating factors beyond a reasonable doubt.
b. Proportionality
{¶ 250} The death penalty is appropriate and proportionate in this case, when compared to death sentences approved in similar cases. See, e.g. , Spaulding , 151 Ohio St.3d 378, 2016-Ohio-8126, 89 N.E.3d 554 (two murders and one attempted murder); State v. Bethel , 110 Ohio St.3d 416, 2006-Ohio-4853, 854 N.E.2d 150, ¶ 212 (course-of-conduct specification for two murders).
L. Proposition of Law No. 1: Consecutive Sentences and Court Costs
{¶ 251} Having affirmed Beasley's capital convictions and death sentences, we turn to issues relating to his sentence for his noncapital convictions. Proposition of law No. 1 alleges two sentencing errors: (1) the court improperly imposed consecutive sentences for the noncapital counts on which he was convicted and (2) the court improperly imposed court costs.
1. Consecutive Sentences
{¶ 252} In order to impose consecutive prison terms for convictions of multiple offenses, a trial court must make three statutory findings. R.C. 2929.14(C) ; State v. Bonnell , 140 Ohio St.3d 209, 2014-Ohio-3177, 16 N.E.3d 659, ¶ 37. First, the *543 court must find that consecutive sentences are necessary to protect the public or to punish the offender. R.C. 2929.14(C)(4). Second, the court must find that consecutive sentences are not disproportionate to the seriousness of the offender's conduct and to the danger that the offender poses to the public. Id. As for the third required finding, a number of different findings will suffice, one of which is that "[t]he offender committed one or more of the multiple offenses while the offender was awaiting trial or sentencing," R.C. 2929.14(C)(4)(a).
{¶ 253} In Bonnell , we held that the trial court must make the requisite findings both at the sentencing hearing and in the sentencing entry. Bonnell at ¶ 37. Here, the trial court did not make the second required finding-proportionality-at Beasley's sentencing hearing or in the sentencing entry.
{¶ 254} The trial court did make two of the three required findings at the sentencing hearing. When the trial judge sentenced Beasley to serve the sentences for the noncapital offenses consecutively, she stated:
Again, the Court specifically makes the finding as required by law that the offenses were committed either while you were at large or awaiting trial and that consecutive sentences are necessary to protect the public.
{¶ 255} Similarly, the sentencing entry states that imposing consecutive sentences as to the noncapital offenses is necessary to protect the public and that Beasley was awaiting trial on another case when the crimes were committed. But neither the sentencing-hearing transcript nor the sentencing entry contains an explicit finding that consecutive sentences are not disproportionate to the seriousness of the offender's conduct and the danger the offender poses to the public.
{¶ 256} The state contends that the trial court was not required to make *1075 R.C. 2929.14(C)(4) findings with respect to the firearm specifications because R.C. 2929.14(C)(1) makes those consecutive sentences mandatory. See State v. Goins , 8th Dist. Cuyahoga No. 103874, 2016-Ohio-5930, 2016 WL 5371854, ¶ 9 ("Because the statute mandates the imposition of consecutive sentences for the firearm specifications, the trial court is therefore not required to make R.C. 2929.14(C)(4) findings before imposing a consecutive sentence"); accord State v. Freeman , 7th Dist. Mahoning No. 14 MA 25, 2014-Ohio-5725, 2014 WL 7358199, ¶ 31. However, Beasley is not challenging his consecutive sentences on the firearm specifications. His challenge is to the consecutive sentences imposed on the noncapital counts.
{¶ 257} At the sentencing hearing, the trial court noted that Beasley was "at large or awaiting trial" at the time the offenses were committed and that "consecutive sentences are necessary to protect the public." But missing is a finding on proportionality. The state suggests that we can "discern" the trial *544 court's views on proportionality from these statements. But the state's analysis removes one of the separate statutorily required findings for consecutive sentences.
{¶ 258} The state also suggests that at least regarding the weapon-under-disability charges, we "can discern that the trial court felt consecutive sentences were proportionate given the seriousness of Beasley's conduct and the danger he posed" because the judge noted that he had committed murders with the weapons that he was not supposed to have had. But the judge's statement reveals nothing about the court's proportionality analysis with respect to the attempted-murder, aggravated-robbery, kidnapping, and identity-fraud convictions, and the sentences for those convictions were also ordered to be served consecutively.
{¶ 259} In Bonnell , we concluded that "the court's description of Bonnell's criminal record as atrocious and its notation of his lack of respect for society" permitted us to discern that the court had found that consecutive sentences were needed to protect the public but did not permit us to conclude that the court had made a finding on proportionality. Bonnell , 140 Ohio St.3d 209, 2014-Ohio-3177, 16 N.E.3d 659, at ¶ 33-34. Similarly, here, the court's statements at the sentencing hearing that consecutive sentences were needed to protect the public and that Beasley was at large or awaiting trial when the offenses were committed demonstrate that the court made findings on two of the three required consecutive-sentencing findings. But there is nothing in these statements to indicate that the court made a finding on proportionality, the third required finding. Thus, as in Bonnell , "we cannot glean from the record that the trial court found consecutive sentences were not disproportionate to the seriousness of the offender's conduct and to the danger the offender poses to the public." Id. at ¶ 36.
{¶ 260} Having found that the sentencing hearing and entry in this case were insufficient to satisfy Bonnell , we turn to the question of remedy. Courts, including this one, have consistently remanded for resentencing when the trial judge has failed to make a proportionality finding when imposing consecutive sentences. See Bonnell at ¶ 37 ; State v. Lawson , 8th Dist. Cuyahoga No. 105038, 2017-Ohio-4189, 2017 WL 2482837, ¶ 6-10 ; State v. Petty , 10th Dist. Franklin No. 15AP-950, 2017-Ohio-1062, 2017 WL 1091583, ¶ 83-94. The state suggests that a new sentencing hearing is not required and that a nunc pro tunc entry will suffice to cure the error. We rejected this contention in Bonnell , id. at ¶ 30, and we reaffirm that conclusion today.
*1076 {¶ 261} Nunc pro tunc entries "are limited in proper use to reflecting what the court actually decided, not what the court might or should have decided or what the court intended to decide." State ex rel. Fogle v. Steiner , 74 Ohio St.3d 158, 164, 656 N.E.2d 1288 (1995). The trial court may have intended to make a proportionality finding regarding Beasley's sentence, but it did not do so and it *545 cannot remedy the oversight by entry. See State ex rel. Mayer v. Henson , 97 Ohio St.3d 276, 2002-Ohio-6323, 779 N.E.2d 223, ¶ 14 (holding that a nunc pro tunc entry was improper because it modified a defendant's sentence to reflect what the trial court intended to decide but did not actually decide). The omission in this case is therefore unlike a Crim.R. 32(C) error. A Crim.R. 32(C) error is a clerical error that can be remedied by a nunc pro tunc entry, because the missing information can be found elsewhere in the record. See State ex rel. DeWine v. Burge , 128 Ohio St.3d 236, 2011-Ohio-235, 943 N.E.2d 535, ¶ 17-19.
{¶ 262} Based on R.C. 2929.14(C)(4)(a) and Bonnell , we vacate Beasley's sentence for his noncapital convictions and remand the case for the limited purpose of resentencing him on those convictions.
2. Court Costs
{¶ 263} A convicted criminal defendant is responsible for the costs of prosecution. R.C. 2947.23(A)(1)(a). The trial court did not mention court costs during the sentencing hearing before imposing them in the entry. Beasley cites State v. Joseph , 125 Ohio St.3d 76, 2010-Ohio-954, 926 N.E.2d 278, for the proposition that it is error for a trial court to impose court costs in its sentencing entry without first informing the defendant during the sentencing hearing of its intent to do so. However, Joseph is no longer good law for this point.
{¶ 264} A trial court has discretion to waive the payment of court costs if the defendant is indigent. State v. White , 103 Ohio St.3d 580, 2004-Ohio-5989, 817 N.E.2d 393, ¶ 14. The result in Joseph was dictated by the fact that at the time of Joseph's trial, an indigent criminal defendant was required to file a motion for waiver of costs at the time of sentencing. Joseph at ¶ 9-12, citing State v. Threatt , 108 Ohio St.3d 277, 2006-Ohio-905, 843 N.E.2d 164, paragraph two of the syllabus. Thus, if the court failed to mention court costs at the sentencing hearing but then ordered the defendant to pay costs in its entry, the defendant would be deprived of an opportunity to seek a waiver. Joseph at ¶ 13. This court therefore remanded "for the limited purpose of allowing Joseph to move the court for a waiver of the payment of court costs." Id. at ¶ 23.
{¶ 265} However, after Joseph was decided and before Beasley was sentenced, the General Assembly amended R.C. 2947.23 by adding division (C): "The court retains jurisdiction to waive, suspend, or modify the payment of the costs of prosecution * * * at the time of sentencing or at any time thereafter ." (Emphasis added.) In simple terms, Beasley does not need this court to remand this case in order for him to file a motion to waive costs. Therefore, his request for a remand on this basis has no merit.
{¶ 266} Proposition of law No. 1 has merit in part. We remand the case for the limited purpose of resentencing Beasley on the noncapital convictions.
*546 III. CONCLUSION
{¶ 267} We hereby affirm Beasley's convictions and his sentences of death. We vacate his sentence for his noncapital convictions and remand the cause to the trial court for a new sentencing hearing consistent with this decision.
Judgment affirmed, sentence affirmed in part and vacated in part, and cause remanded.
O'Donnell and Fischer, JJ., concur.
Kennedy and French, JJ., concur in judgment only.
O'Neill, J., concurs in part and dissents in part for the reasons set forth in his dissenting opinion in State v. Wogenstahl, 134 Ohio St.3d 1437, 2013-Ohio-164, 981 N.E.2d 900.
DeWine, J., concurs in part and dissents in part, with an opinion.

Matthew 7:15: "Beware of false prophets, which come to you in sheep's clothing but inwardly are ravening wolves." King James Version.

Beasley also cites an instance in which the trial court, without any parties or counsel present, made a brief record noting the times of day at which the jury began and concluded its deliberations. It is not clear how this can constitute ineffective representation by his trial counsel.

Beasley's brief claims that this occurred a third time, but the record does not support his assertion.

With respect to three of the witnesses, the cited transcript pages come from their direct testimony.

As the jury watched silent surveillance video of a parking lot, Vickery narrated the events occurring on screen. Beasley includes this in his hearsay objection without explaining how this involved hearsay.

Beasley also notes that the first Craigslist ad was not posted until October 2011, long after Geiger's death, but this fact has no obvious probative value because Beasley admitted knowing Geiger personally.